IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| Jody Edwin Griffith #249169<br>Full name and prison number<br>Of Plaintiff(s)<br><br>v.<br><br>Gary Anderson, Officer; Unknown<br><br>Peterson, Officer; John Doe, Nurse;<br><br>and Jane Doe, Nurse<br><br><br><br>Name of person(s) who violated<br>Your constitutional rights.<br>(List the names of all<br>persons.) | RECEIVED<br>2007 AUG 22 A 10: 03<br>DEBRA P. HACKETT, CLK<br>U.S. DISTRICT COURT<br>MIDDLE DISTRICT ALA<br>CIVIL ACTION NO.<br>(To be supplied by Clerk of<br>U.S. District Court)<br>2:07CV749-MEF |

I.  PREVIOUS LAWSUITS

    A.  Have you begun other lawsuits in state or federal court dealing with the same or similar facts involved in this action?   YES ( )   NO ( x )

    B.  Have you begun other lawsuits in state or federal court relating to your imprisonment?   YES ( )   NO ( x )

    C.  If your answer to A or B is yes, describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

        1.  Parties to this previous lawsuit:

            Plaintiff(s) _n/a_

            Defendant(s) _n/a_

        2.  Court ) if federal court, name the district; if state court, name the county) _n/a_

1

3. Docket number  n/a

4. Name of judge to whom case was assigned  n/a

5. Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?)  n/a

6. Approximate date of filing lawsuit  n/a

7. Approximate date of disposition  n/a

II. PLACE OF PRESENT CONFINEMENT  Limestone Correctional Facility; Dorm E-A-18B, 28779 Nick Davis Road, Harvest, Alabama 35749

PLACE OF INSTITUTION WHERE INCIDENT OCCURRED  Kilby Correctional Facility; Montgomery, Alabama

III. NAME AND ADDRESSES OF INDIVIDUAL(S) YOU ALLEGE VIOLATED YOUR CONSTITUTIONAL RIGHTS.

NAME                                    ADDRESS

1. Gary Anderson, Kilby Correctional Facility, Montgomery, Alabama
2. Unknown Peterson, Kilby Correctional Facility, Montgomery, Alabama
3. John Doe; Kilby Correctional Facility, Montgomery, Alabama
4. Jane Doe; Kilby Correctional Facility, Montgomery, Alabama
5. 
6. 

[handwritten margin note: Kilby Correctional Facility P.O. Box 150 Mt. Meigs, AL 36057]

IV. THE DATE UPON WHICH SAID VIOLATION OCCURRED  November 23, 2006

V. STATE BRIEFLY THE GROUNDS ON WHICH YOU BASE YOUR ALLEGATION THAT YOUR CONSTITUTIONAL RIGHTS ARE BEING VIOLATED:

GROUND ONE:  see attached complaint

2

STATE BRIEFLY THE FACTS WHICH SUPPORT THIS GROUND. (state as best you can the time, place and manner and person involved)

see attached complaint

GROUND TWO: see attached complaint

SUPPORTING FACTS: see attached complaint

GROUND THREE: see attached complaint

SUPPORTING FACTS: see attached complaint

3

VI. STATE BRIEFLY EXACTLY WHAT YOU WANT THE COURT TO DO FOR YOU. MAKE NO LEGAL ARGUMENT. CITE NO CASES OR STATUTES.

Make a declaratory finding of fact stating that Plaintiff's civil and constitutional rights were violated by the Defendants; award compensatory and punitive damages against the Defendants; and award other relief as may be warranted.

_____
Signature of plaintiff(s)

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on ___August 14, 2007___.
(Date)

_____
Signature of plaintiff(s)

4

## PRELIMINARY STATEMENT

1. This is a civil rights action brought by the Plaintiff, Jody Edwin Griffith, a former Alabama Department of Corrections officer and current inmate within the Alabama penal system. He is seeking declaratory relief and damages pursuant to 42 U.S.C. § 1983, raising claims of assault and battery, excessive use of force, personal injury, denial of medical care, and deliberate indifference; all arising from an incident wherein he was beaten by other corrections officers while at Kilby Correctional Facility in Montgomery, Alabama. These actions violated Plaintiff's constitutional rights guaranteed under the Eighth and Fourteenth Amendments to the United States Constitution. The Plaintiff also raises the state law torts of assault and battery, personal injury, and/or contributory negligence.

## JURISDICTIONAL STATEMENT

2. This Court has jurisdiction over the Plaintiff's claims of violation of federal constitutional rights under 42 U.S.C. §§ 1331(a) and 1343. This Court has supplemental jurisdiction over the Plaintiff's state tort claims under 28 U.S.C. § 1367. The Plaintiff also invokes this honorable court's pendant jurisdiction.

## PARTIES TO THE CASE

3. The Plaintiff, Jody Edwin Griffith, is a former corrections officer with the Alabama Department of Corrections, and is now an inmate within the Alabama penal system, currently housed at Limestone Correctional Facility in Harvest, Alabama.

4. Defendant Gary Anderson is a corrections officer employed by the Alabama Department of Corrections at Kilby Correctional Facility in Montgomery, Alabama. He is being sued in his individual capacity.

5. Defendant Officer Peterson[1] is a corrections officer employed by the Alabama Department of Corrections at Kilby Correctional Facility in Montgomery, Alabama. He is being sued in his individual capacity..

6. Defendants John Doe and Jane Doe are medical nursing personnel employed by the Alabama Department of Corrections and work at Kilby Correctional Facility in Montgomery, Alabama. They are being sued in their individual capacities.

7. All the defendants have acted, and continue to act, under color of state law at all times relevant to this complaint.

---

[1] The first name of defendant Peterson, as well as the names of defendants John Doe and Jane Doe, are presently unknown to the Plaintiff and will be supplied to the court following discovery.

5

## FACTS OF THE CASE

8. The Plaintiff, a former Corrections Officer for the Alabama Department of Corrections, was convicted by a jury in Etowah County following a self-defense-type shooting, and he was sentenced to 35 years in prison; he arrived at Kilby Correctional Facility on November 8, 2006, to begin serving his sentence.

9. Upon entry into the prison system, Plaintiff was immediately separated and classified as a protective custody inmate based on his employment as a corrections officer for the previous ten years. This procedure is presumptively designed to ensure the safety of former corrections officers who may be recognized by other officers and inmates.

10. Plaintiff was placed in a single man isolation cell for his protection and kept segregated from other inmates at all times, which also meant he had to be escorted to and from the shower area every other day to bathe. While housed in this unit, Plaintiff was subjected to verbal abuse and threats due to his employment history and protective custody status.

11. On November 23, 2006, at approximately 4:30 p.m., Defendant Peterson approached Plaintiff's cell, and informed him to get ready to take a shower; Plaintiff was then handcuffed behind the back, released from his cell, and was directed toward the lower tiers' stairwell and shower area.

12. Upon arrival to the C-Block shower area, Plaintiff was standing with another inmate, Christopher J. Jordan, (W/M 161847), along with Defendant Anderson, who was awaiting a third inmate, Wendell Lovell, (AIS# 111432) to finish showering.

13. Defendant Anderson removed the handcuffs from Plaintiff and inmate Jordan while standing beside them outside the shower cage. Defendant Anderson briefly walked away from the area but quickly returned.

14. Defendant Anderson then opened the door to the shower cage, allowing inmate Lovell to exit the shower and inmate Jordan to enter the shower cage. Defendant Anderson then instructed Plaintiff to enter the shower along with inmate Jordan.[2]

15. Plaintiff and inmate Jordan both stripped naked and began showering; after Plaintiff and inmate Jordan were in the shower approximately two minutes, Defendant Anderson stated, "Waldo, can't you talk and shower at the same time?"

16. Plaintiff realized that Defendant Anderson was referring to him as "Waldo", a reference to a tall and lanky children's book cartoon character, replied, "I am showering" and continued his conversation while showering alongside inmate Jordan.

---

[2] Placing both inmates into the same shower together was unusual because both Plaintiff and inmate Jordan were protective custody inmates and were supposed to shower alone.

6

17. Defendant Anderson stated "That's it, Waldo! Get your ass out of the shower!" and Plaintiff began to comply by rinsing the shampoo from his hair and body to begin getting out of the shower. Defendant Anderson briefly walked from the shower area, but returned as Plaintiff was drying himself off with his towel in the front corner of the shower cage, away from the showerheads.

<u>Misuse of Force</u>

18. Without warning, Defendant Anderson opened the shower cage's steel door very forcefully, striking Plaintiff, who was standing in the corner behind the metal door, on the left arm in the wrist area.

19. Defendant Anderson entered the shower cage with Plaintiff and inmate Jordan with a baton in his right hand, and immediately struck Plaintiff on the left leg approximately four inches above the knee with the baton. Defendant Anderson then grabbed Plaintiff by the left arm, attempting to forcefully remove him from the shower cage.

20. Defendant Anderson then proceeded to assault Plaintiff with his baton and hands; during the incident, Defendant Anderson also jerked Plaintiff by the arm, causing Plaintiff to lose his balance on the slippery shower surface, fall down, hit his head on the concrete floor, and momentarily lose consciousness.

21. When Plaintiff regained consciousness, he was lying on the floor on the outside of the shower, still naked with his towel laying beside him on the floor; he was wearing only one shower shoe, and the other shower shoe was still laying inside the shower cage. Defendant Anderson was tapping Plaintiff in the upper body area with either his boot or the baton, telling Plaintiff to "take your bitch ass back to your cell!"

22. While still lying on the floor, Plaintiff requested to be taken to the infirmary for treatment and to speak with the 'Shift Commander'; Defendant Anderson then threatened Plaintiff by saying, "If you don't take your bitch ass back to your cell I'm gonna take this stick to your ass again!"

<u>Denial of Medical Care</u>

23. Plaintiff could hear some other inmates making comments to Defendant Anderson about the incident while Plaintiff was still lying in the floor; still dazed and unable to stand, Plaintiff repeatedly requested to "see the Shift Commander" and to "go to the infirmary", but Defendant Anderson only instructed Plaintiff to return to his cell.

24. After lying on the floor in front of the shower for approximately five minutes, naked and in full view of other inmates, Plaintiff was finally able to return to his assigned cell; once there, another corrections officer, who was working the D-Block cubicle during the incident, closed and secured Plaintiff's cell door.

25. Another officer, Defendant Peterson, came and asked for Plaintiff's handcuffs, but Plaintiff explained that he was not handcuffed; he then reported the incident to Defendant Peterson. Plaintiff again asked to speak to the 'Shift Commander' and to be taken to the

infirmary, but Defendant Peterson told Plaintiff, "I'll tell [Defendant Anderson] to come talk to you" and walked away from the area.

26. After approximately forty-five minutes, Plaintiff stopped another witness, Officer Dinkins[3], as he walked by; Plaintiff reported the incident to Officer Dinkins and once more asked to be taken to the infirmary and to talk to the Shift Commander.

27. Officer Dinkins left the area and returned in a few minutes, placed handcuffs on Plaintiff, and escorted Plaintiff to the prison's infirmary. Upon arrival at the infirmary, Officer Dinkins placed Plaintiff's handcuffs in the front and instructed Plaintiff to have a seat in a chair.

28. Defendant Jane Doe, a female nurse, sat down by Plaintiff and began assessing Plaintiff's injuries, asking the nature of the problem and taking his vital signs. Plaintiff observed corrections officers Lee Hall and another unknown officer, along with another male nurse, Defendant John Doe, enter the infirmary, and the female nurse again asked Plaintiff to point out his injuries. Plaintiff pulled his pants down to expose the injury sustained on rear of left leg.

29. The female nurse asked, "What happened here?" and Plaintiff answered, "Missed common peroneal shot". The unknown officer asked, "What do you know about a common peroneal?" and Plaintiff responded "Class 94-3. I was a Corrections Officer for ten years". The unknown officer then said he was "class 85-3 or 86-3".

30. Officer Lee Hall then exited the infirmary; Officers Dinkins and the unknown officer stepped to Plaintiff's right posterior and began talking to one another; while the female nurse asked the male nurse to complete the Medical Chart that she had already started.

31. The male nurse asked Plaintiff, "What's wrong?" and Plaintiff stated that he had been assaulted. The male nurse again asked to see Plaintiff's injuries, so Plaintiff lowered his pants a third time, exposing the injury to his left hip area. The male nurse then stated to the female nurse "You going to make me look all at the man's ass when I was about to eat"?

32. The male nurse asked, "What else?" and Plaintiff began pointing out all the injuries he sustained in the assault, including his head and side. The male nurse asked, "Who was it that assaulted you?" Plaintiff stated, "An Officer", but Plaintiff refused to answer when asked specifically which officer had assaulted him.

33. The male nurse stated, "There's sixteen hundred [inmates] and only thirty or forty [officers]. Who do you expect me to side with"? Plaintiff asked, "So you are not going to document any of the injuries?" The male nurse answered, "I don't see anything". The male nurse then told Officer Dinkins that Plaintiff could go back to his cell.

34. Plaintiff asked for a copy of the medical form, but his request was denied. Officer Dinkins then moved Plaintiff's handcuffs from the front to the back and escorted Plaintiff out of the infirmary and into a hallway area.

---

[3] The first name of Officer Dinkins is presently unknown to Plaintiff, but will be supplied to the court upon discovery.

35. Plaintiff requested Officer Dinkins to permit him to speak to a supervisor about the incident of assault and to report the medical personnel's refusal to document the injuries he sustained during the incident. Officer Dinkins stated that he would personally make sure Plaintiff had a chance to speak to a supervisor. Officer Dinkins then escorted Plaintiff back to his assigned cell.

36. Approximately thirty minutes later, Officer Dinkins arrived at Plaintiff's cell and brought along another witness, a Sergeant Smith. Plaintiff explained the entire incident to Sergeant Smith, including what transpired in the shower and infirmary. After seeing the extent of Plaintiff's injuries, Sergeant Smith questioned Inmate Jordan about the incident he witnessed.

37. Approximately five minutes later Plaintiff and Inmate Jordan were asked to write a statement describing the incident. At 9:20 p.m., Officer Penn escorted Plaintiff to another room within the Segregation Unit where Sergeant Smith, the male nurse, and the female nurse entered the room to complete a second medical form documenting the injuries Plaintiff sustained during the assault.

38. Plaintiff began showing his injuries to the nurses, but the male nurse questioned Sergeant Smith about the size of the wounds on Plaintiff's left knee. When Plaintiff also complained of pain and swelling on the left side of his head above the left ear, the male nurse claimed to see nothing. Sergeant Smith, seeing the swelling, pointed to the same area mentioned by Plaintiff and asked, "What's that?" The male nurse, still refusing to see the obvious, stated, "That's just how his head is shaped". After the observation was completed, Officer Penn again escorted Plaintiff back to his assigned cell.

39. The following day, November 24, 2006, Plaintiff made a written request to use the phone to inform his family and attorney of the assault. At approximately 1:00 p.m., a Lieutenant Crow came and questioned Plaintiff about the assault the previous night. After rehashing the incident, Plaintiff was allowed to use the phone.

40. At approximately 2:20 p.m., an Officer Craig came and escorted Plaintiff to a room across the hallway of the Shift Commander's office, where Plaintiff was again questioned by a Sergeant Riley about the assault. Plaintiff's injuries were photographed and documented. Plaintiff again complained of pain and dizziness in his left ear area from an injury that occurred during the incident..

41. On November 27, 2006, at approximately 9:30 a.m., an Officer Surles escorted Plaintiff to an office and was questioned by a Captain Barrett. Captain Barrett asked Plaintiff who had assaulted him (due to Plaintiff's referring to an "Officer Williams" in a statement). After giving a physical description of the officer who had assaulted him, Captain Barrett informed Plaintiff that officer "Williams" was actually Defendant Anderson. Plaintiff was again escorted back to his assigned cell after questioning was completed.

42. An Officer Pettiway came and informed Plaintiff that he was being moved to another cell, and Officer Pettaway escorted him to Cell EB-01 that is primarily used to house death row or mentally ill inmates.

43. At approximately 1:00 p.m., Plaintiff was treated by nursing staff, who informed him that his ear was indeed infected and needed medication, which would be ordered. At approximately 3:30 p.m., an Officer Streeter escorted Plaintiff to an office where Lieutenant Clay questioned him again. Lieutenant Clay made more photographs of Plaintiff's injuries. Officer Streeter then escorted Plaintiff back to his newly assigned cell.

44. On December 5, 2006 at approximately 10:00 a.m., Plaintiff was escorted to the administrative section of the prison and questioned by an investigator from the Alabama Department of Corrections' Intelligence and Investigation Unit (I&I). Plaintiff gave a recorded interview, and was then returned to his cell. He was told that the incident was under investigation.

45. Because of the beating, the Plaintiff's ear remained infected for approximately another week and he continued to experience acute pain and suffering for approximately one month; additionally, Plaintiff has continued to experience long term effects of the beating in the form of emotional and mental distress.

46. Plaintiff now submits a sworn affidavit to this court detailing in support of these statements; (see Affidavit of Jody Griffith, attached "Exhibit A"). As this Court can see from the facts, the assault on Plaintiff was neither provoked nor warranted, and the actions of the defendants clearly violated the Plaintiff's civil and constitutional rights under law.

## STATEMENT OF CLAIMS FOR RELIEF

47. The actions of defendant Anderson in using physical force against the Plaintiff without need or provocation were done maliciously and/or sadistically; furthermore, these actions constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

48. The actions of defendant Anderson in assaulting and battering Plaintiff were done maliciously, sadistically, and intentionally; furthermore, these actions resulted in personal injury to the Plaintiff and constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

49. The actions of defendant Peterson in supplying defendant Anderson with the baton used to assault Plaintiff, or in failing to intervene to prevent the misuse of force against Plaintiff, were done maliciously and/or sadistically; furthermore, these actions constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

50. The actions of defendant Peterson in failing to take preventive action to curb the known pattern of physical abuse of inmates by defendant Anderson constitutes deliberate indifference and contributory negligence; furthermore, the actions contributed to, and proximately caused, the above-described assault and battery in violation of Plaintiff's Eighth Amendment rights.

51. The actions of defendants John Doe and Jane Doe in refusing to examine, evaluate, and treat Plaintiff's injuries, document Plaintiff's injuries, provide Plaintiff with proper medical care, and ignoring Plaintiff's pain and suffering constitute deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth amendment to the United States Constitution.

## RELIEF SOUGHT

The Plaintiff respectfully requests this Honorable Court to grant the following relief:

A: Issue a declaratory judgement stating:

   i. that defendant Anderson violated Plaintiff's civil and constitutional rights by employing the misuse of force, without justification or provocation, and committed assault and battery against Plaintiff which resulted in physical injury to the Plaintiff.

   ii. that defendant Peterson violated Plaintiff's civil and constitutional rights by providing defendant Anderson with the baton used in the assault and battery on Plaintiff, and failed to take action to curb the physical abuse of prisoners by defendant Anderson

   iii. that defendants John Doe and Jane Doe violated Plaintiff's civil and constitutional rights by denying him access to adequate medical care for a known injury and refusing to properly document the extent of Plaintiff's injuries.

B: Award compensatory damages in the following amounts:

   i. $100,000 against defendant Anderson for the physical and emotional injuries sustained by Plaintiff as a result of Anderson's malicious, sadistic, and intentional actions.

   ii. $15,000 against defendant Peterson for the physical and emotional injuries sustained by Plaintiff as a result of Peterson's intentional, contributory negligence, and/or deliberate indifference actions.

   iii. $1 against jointly and severally against defendants John Doe and Jane Doe for the pain and suffering sustained by Plaintiff as a result of the defendants' deliberate indifference and denial of medical care.

C: Award punitive damages in the following amounts:

   i. $20,000 against defendant Anderson
   ii. $15,000 against defendant Peterson

D: Grant all court costs, filing fees, and attorney expenses to be paid by the defendants.

E. Grant other such relief as it may appear to the Court that the Plaintiff may be entitled.

Jody Griffith W/m 249169
Limestone C.F. E-18B
28779 Nick Davis Rd.
Harvest, Al. 35749

HUNTSVILLE
20 AUG 2007

This correspondence is forwarded from an Alabama State Prison. The contents have not been evaluated, and the Alabama Department of Corrections is not responsible for the substance or content of the enclosed communication.

Office Of The Clerk
United States District Court
P.O. Box 711
Montgomery, Al. 36101-0711

# EXHIBIT A

STATE OF ALABAMA

COUNTY OF LIMESTONE

AFFIDAVIT OF JODY GRIFFITH

I, Jody Edwin Griffith, plaintiff, pro se, having been duly sworn, appear before the below-signed notary public, and declare the following:

1. I am a former Corrections Officer for the Alabama Department of Corrections, where I was employed for ten years prior to my arrest in a separate case. I was convicted by a jury in Etowah County following a self-defense-type shooting, and I was sentenced to 35 years in prison; on November 8, 2006, I arrived at Kilby Correctional Facility to begin serving my prison sentence.

2. Upon entry into the prison system, I was immediately separated and classified as a protective custody inmate based on my employment as a corrections officer. This procedure is supposed to ensure the safety of former corrections officers who may be recognized by other officers and inmates. I was placed in a single man isolation cell for my own protection and kept segregated from the other inmates at all times, which also meant I had to be escorted to and from the shower area every other day to bathe.

3. On November 23, 2006, at approximately 4:30 p.m., Officer Peterson approached my cell, and informed me to get ready to take a shower; I was then handcuffed behind the back, released from my cell, and was directed toward the lower tiers' stairwell and shower area. Upon arrival to the C-Block shower area, I was standing with another inmate, Christopher J. Jordan, (W/M 161847), along with Officer Anderson, who was awaiting a third inmate, Wendell Lovell, (AIS# 111432) to finish showering.

4. Officer Anderson seemed to be in a hurry and removed the handcuffs from inmate Jordan and myself while standing beside us outside the shower cage. It was very unusual for an officer to leave two protective custody inmates together while un-handcuffed. Officer Anderson walked away from the shower area but quickly returned a few moments later. When I looked in the shower again, there were two showerheads spraying instead of one, so I believe Officer Anderson turned on the second showerhead when he had walked away.

5. Officer Anderson then opened the door to the shower cage, allowing inmate Lovell to exit the shower and inmate Jordan to enter the shower cage. Officer Anderson instructed me to enter the shower along with inmate Jordan. This was also unusual because we were both protective custody inmates and were supposed to shower alone.

6. Inmate Jordan and myself both stripped naked and began showering; after inmate Jordan and I were in the shower approximately two minutes, Officer Anderson stated, "Waldo, can't you talk and shower at the same time?" Inmate Jordan and myself had both been talking, so I did not immediately know the officer was talking to me; we had not stopped showering to talk, but merely made a few comments back and forth. I finally realized that Officer Anderson was referring to me as "Waldo", a reference to a tall and lanky children's

1

book cartoon character. I replied, "I am showering [while I talk]" and continued chatting while showering alongside inmate Jordan.

7. Officer Anderson stated "That's it, Waldo! Get your ass out of the shower!" and I began to comply by rinsing the shampoo from my hair and body to begin getting out of the shower. Officer Anderson briefly walked from the shower area, and returned as I was drying myself off with a towel in the front corner of the shower cage, away from the showerheads. I was complying with Officer Anderson's instructions to get out of the shower.

8. When Officer Anderson returned, he had a fiberglass baton that he had borrowed from Officer Peterson[1]. I heard the shower door keys rattling, and I thought Officer Anderson was going to let me exit the shower so another inmate could enter. Without warning, Officer Anderson opened the shower cage's steel door very forcefully, striking me as I was standing in the corner behind the metal door, on the left arm and the wrist area. I was surprised that he had intentionally hit me with the metal door.

9. Officer Anderson then entered the shower cage with the baton in his right hand and immediately hit me again on the left leg approximately four inches above the knee. Officer Anderson grabbed me by the left arm, attempting to forcefully remove me from the shower cage. Officer Anderson then proceeded to assault me with the baton and his hands; during the incident, he also jerked me by the arm, causing me to lose my balance, fall down, hit my head on the concrete floor, and momentarily lose consciousness.

10. When I regained consciousness, I was lying on the floor on the outside of the shower, still naked with my towel laying beside me on the floor; I was wearing only one shower shoe, and the other shower shoe was laying inside the shower cage. Officer Anderson was tapping me in the upper body area with either his boot or the baton, telling me to "take your bitch ass back to your cell!"

11. I was confused and did not really know what was happening or why Officer Anderson was treating me this way for no reason. While still lying on the floor, I requested to be taken to the infirmary for treatment and to speak with the 'Shift Commander'; Officer Anderson then threatened me by saying, "If you don't take your bitch ass back to your cell [right now], I'm gonna take this stick to your ass again"!

12. I could hear some other inmates making comments to Officer Anderson about the incident while I was still lying in the floor; still dazed and unable to stand, I repeatedly requested to "see the Shift Commander" and to "go to the infirmary", but Officer Anderson only instructed me to return to my cell.

13. After lying on the floor in front of the shower for approximately five minutes, naked and in full view of other inmates, I was finally able to return to my assigned cell; once there, another corrections officer, who was working the D-Block cubicle during the incident, closed and secured my cell door.

---

[1] I was told after the incident that Officer Peterson had supplied Officer Anderson with the baton to be beat me, and that Officer Peterson did not want the incident investigated because of this reason.

14. Officer Peterson came to my cell and asked for his handcuffs, but I explained that I was not handcuffed. I reported the assault to Officer Peterson and again asked to speak to "the Shift Commander" and "to be taken to the infirmary", but Officer Peterson only told me, "I'll tell [Officer Anderson] to come talk to you" and walked away from the area.

15. After waiting approximately forty-five minutes, I stopped another witness, Officer Dinkins, as he walked by; I reported the incident to Officer Dinkins and once more asked to be taken to the infirmary and to talk to the Shift Commander. Officer Dinkins left the area and returned in a few minutes, placed handcuffs on me, and escorted me to the prison's infirmary. Upon arrival at the infirmary, Officer Dinkins placed my handcuffs in the front and instructed me to have a seat in a chair.

16. A female nurse sat down by me and began assessing my injuries, asking the nature of the problem and taking my vital signs. I observed corrections officers Lee Hall and another unknown officer, along with another male nurse, enter the infirmary, and the female nurse again asked me to point out my injuries. I pulled my pants down to expose the injury sustained on rear of left leg.

17. The female nurse asked, "What happened here?" and I answered, "Missed common peroneal shot". The unknown officer asked, "What do you know about a common peroneal?" and I responded "Class 94-3. I was a Corrections Officer for ten years". The unknown officer replied that he was "Class 85-3 or 86-3".

18. Officer Lee Hall then exited the infirmary; Officers Dinkins and the unknown officer stepped to my right posterior and began talking to one another; while the female nurse asked the male nurse to complete the Medical Chart that she had already started. She indicated that she did not want to be involved with an incident where an officer had assaulted an inmate, and deferred me to the male nurse instead.

19. The male nurse asked me, "What's wrong?" and I stated that I had been assaulted. The male nurse again asked to see my injuries, so I lowered my pants a third time, exposing the injury to my left hip area. The male nurse then stated to the female nurse "You going to make me look all at the man's ass when I was about to eat"? This statement was entirely inappropriate and unprofessional, since I was only trying to get medical treatment for my injuries.

20. The male nurse asked, "What else?" and I began pointing out all the other injuries I sustained in the assault, including my head and side. The male nurse asked, "Who was it that assaulted you?" I stated, "An Officer", but I refused to answer when asked specifically which officer had assaulted me.

21. The male nurse stated, "There's sixteen hundred [inmates] and only thirty or forty [officers]. Who do you expect me to side with"? I asked, "So you are not going to document any of the injuries?" The male nurse answered, "I don't see anything". The male nurse then told Officer Dinkins that I could go back to my cell. I felt that the medical staff was attempting to cover-up the assault by intentionally ignoring my injuries and/or refusing to document them.

22. I asked for a copy of the medical form, but my request was denied. Officer Dinkins then moved my handcuffs from the front to the back and escorted me out of the infirmary and into a hallway area. I again requested that Officer Dinkins permit me to speak to a supervisor about the incident of assault and to report the medical personnel's refusal to document the injuries I sustained during the incident. Officer Dinkins stated that he would personally make sure I had a chance to speak to a supervisor. Officer Dinkins then escorted me back to my assigned cell.

23. Approximately thirty minutes later, Officer Dinkins arrived at my cell and brought along another witness, a Sergeant Smith. I explained the entire incident to Sergeant Smith, including what transpired in the shower and infirmary. After seeing the extent of my injuries, Sergeant Smith questioned Inmate Jordan about the incident he witnessed.

24. Approximately five minutes later Inmate Jordan and I were asked to write a statement describing the incident. At 9:20 p.m., Officer Penn escorted me to another room within the Segregation Unit where Sergeant Smith, the male nurse, and the female nurse entered the room to complete a second medical form documenting the injuries that I sustained during the assault.

25. I began showing my injuries to the nurses, but the male nurse questioned Sergeant Smith about the size of the wounds on my left knee. Sergeant Smith did not respond to the inquiry but seemed to acknowledge my complaint of proper documentation. When I also complained of pain and swelling on the left side of my head above the left ear, the male nurse claimed to see nothing. Sergeant Smith, seeing the swelling, pointed to the same area mentioned and asked, "What's that?" The male nurse, still refusing to see the obvious, stated, "That's just how his head is shaped". I also complained about the pain and difficulty hearing in my left ear, but the male nurse just stated it was "probably just water in my ear". After observation was completed on the night of the incident, Officer Penn again escorted me back to my assigned cell.

26. The following day, November 24, 2006, I made a written request to use the phone to inform my family and attorney of the assault. At approximately 1:00 p.m., a Lieutenant Crow came and I was questioned about the assault the previous night. After rehashing the incident, I was allowed to use the phone. At approximately 2:20 p.m., an Officer Craig came and escorted me to a room across the hallway of the Shift Commander's office, I was again questioned by a Sergeant Riley about the assault. My injuries were photographed and documented. I again complained of pain and dizziness in his left ear area.

27. On November 27, 2006, at approximately 9:30 a.m., an Officer Surles escorted me to an office where a Captain Barrett questioned me. Captain Barrett asked me who had assaulted me (due to my referring to an "Officer Williams" in a statement). After giving a physical description of the officer who had assaulted me, Captain Barrett informed me that "Officer Williams" was actually Officer Anderson. I was again escorted back to my assigned cell.

28. An Officer Pettaway came and informed me that I was being moved to another cell, and Officer Pettaway escorted me to Cell EB-01 that is primarily used to house death row or mentally ill inmates. At approximately 1:00 p.m., I was treated by nursing staff, who then informed me that my ear was indeed infected and needed medication, which would be

ordered. At approximately 3:30 p.m., an Officer Streeter escorted me to an office where Lieutenant Clay questioned me again. Lieutenant Clay made more photographs of my injuries. Officer Streeter then escorted me back to my newly assigned cell.

29. On December 5, 2006 at approximately 10:00 a.m., I was escorted to the administrative section of the prison and questioned by an investigator from the Alabama Department of Corrections' Intelligence and Investigation Unit (I&I). I gave a recorded interview, and was then returned to my cell. I was told that the incident was being investigated.

30. I feel that Officer Anderson may have assaulted me because of my small size and stature: at the time of the incident, I only weighed 135 pounds and was 6'3" tall, so I was very skinny. Officer Anderson was approximately 230 pounds and 6'0" tall, so he was much larger than me and could easily jerk me around and toss me about.

31. The assault on me was neither provoked nor warranted. I did not do anything to justify being treated in this manner. I did not defy or resist Officer Anderson's orders in any way. Even if I had defied his verbal instructions, proper protocol would have been for him to call for back up and notify a supervisor. Instead, he chose to attack and assault for no reason. Furthermore, after any incident involving the use of force, an officer is supposed to notify a supervisor, immediately escort the inmate to the infirmary for treatment, and document the entire incident. This was not done after the incident in which I was beaten.

32. Because of the beating, my ear remained infected for approximately one week, and I continued to experience acute pain and suffering for another month; additionally, I have continued to experience long-term effects of the beating in the form of emotional and mental distress, nightmares, and headaches. I feel that the actions of the defendants clearly violated my civil and constitutional rights under law.

_Jody Griffith_      8-14-07
Jody Griffith             Date

## NOTARY PUBLIC

State of Alabama
County of Limestone

I, the under-signed Notary Public in and for the said county and state, hereby certify that the affiant whose name is signed to the fore-going affidavit, appeared before me and executed the same in my presence and is declared under my seal on this 14th day of August, 2007.

My commission expires:
9-8-2010

_Notary Public_      8-14-07
Notary Public           Date

5