**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **JODY EDWIN GRIFFITH** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )   **2:07-CV-749-MEF** |
| **GARY ANDERSON, ET AL.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |

**SUPPLEMENTAL SPECIAL REPORT**

COME NOW the Defendants, **Gary Anderson** and **Anthony Peterson**, by and through undersigned counsel, and in accordance with this Honorable Court's October 17, 2007, Order, supplement their previously filed Special Report as follows:

**PARTIES**

1. The Plaintiff, Jody Edwin Griffith, is an inmate of the Alabama Prison System. Plaintiff is currently serving a 35 year sentence for murder.

2. Defendant Gary Anderson is a Correctional Officer at Kilby Correctional Facility in Mt. Meigs, Alabama.

3. Defendant Anthony Peterson is a Correctional Officer at Kilby Correctional Facility in Mt. Meigs, Alabama.

4. Plaintiff has alleged other fictitious parties which is not allowed under the Federal Rules of Civil Procedure.

## EXHIBITS

EXHIBIT 1 – Affidavit of Art Crumpton with attachments

## PLAINTIFF'S CLAIMS

Plaintiff claims that he was beaten by Officer Anderson while in the showers of the segregation unit at Kilby Correctional Facility. Plaintiff claims that Officer Peterson provided Officer Anderson with a fiberglass baton but does not allege that Officer Peterson assisted in beating Plaintiff nor does he allege that Officer Peterson was in a position to prevent any alleged use of excessive force. Plaintiff vaguely alleges that both Officers denied him access to medical attention following the incident. Plaintiff demands compensatory damages, punitive damages and injunctive relief.

## DEFENDANTS' RESPONSE

1.  The Defendants deny that they violated the Plaintiff's constitutional rights.

2.  The Defendants deny each and every material allegation not specifically admitted herein and demand strict proof thereof.

3.  The Plaintiff has failed to state a claim upon which relief may be granted.

4.  The Defendants are immune from suit under the Eleventh Amendment to the United States Constitution.

5.  The Defendants are immune from suit due to qualified immunity.

## SUPPLEMENTAL STATEMENT OF FACTS

The incident made the basis of this suit was forwarded to the Investigation and Intelligence Division of the Alabama Department of Corrections. Attached is the documentation generated by the investigation. See, Exhibit 1. These Defendants are

producing the records pursuant to the Court's order, but specifically reserve any objection

to the admissibility of these documents at trial should this matter proceed to that point.

## ARGUMENT

The Defendants adopt and incorporate herein the argument in their previously

filed Special Report (Doc. 14).

## CONCLUSION

There are no genuine issues of material fact, and the Defendants are entitled to

judgment as a matter of law.   WHEREFORE, the Defendants respectfully request that

this Honorable Court dismiss the claims against them.

Respectfully submitted,

TROY KING
Attorney General

*/s/ Benjamin H. Albritton*
Benjamin H. Albritton (ASB-0993-R67B)
Assistant Attorney General

ADDRESS OF COUNSEL:

Office of the Attorney General
11 South Union Street
Montgomery, AL 36130
(334) 242-7300
(334) 242-2433 – fax

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have, this the 31st day of October, 2007, served a copy of

the foregoing upon the Plaintiff by placing same in the United States Mail, postage

prepaid and properly addressed as follows:

Jody Edwin Griffith, AIS 249169
Limestone Correctional Facility
28779 Nick Davis Road
Harvest, AL  35749

                              */s/ Benjamin H. Albritton*
                              Benjamin H. Albritton
                              Assistant Attorney General



# *State of Alabama*
# *Alabama Department of Corrections*

Investigation and Intelligence Division
P.O. Box 301501  Ste. A2-504
Montgomery, Al 36130



**BOB RILEY**
GOVERNOR

**RANDY YARBROUGH**
DIRECTOR

**RICHARD ALLEN**
COMMISSIONER

**ART CRUMPTON**
ASST. DIRECTOR

October 25, 2007

I, Art Crumpton, herby certify and affirm in writing that, I am Art Crumpton of the Alabama Department of Corrections, organized or operated pursuant to or under the laws of Alabama, located at Investigations and Intelligence Division, Montgomery, Alabama and to the effect that the records are all of the documents generated as a result of the investigation of this incident;

1. Investigative Report  and other reports and forms
2. Statements
3. Photos

are exact, full, true and correct photo copies.

I further certify that the said documents are kept in the usual and regular course of business in the files currently located at Investigations and Intelligence Division, Montgomery, Alabama.

_____
Art Crumpton

_____
Notary Public

_____
MY COMMISSION EXPIRES
9/7/2011

Telephone (334) 353-8912                    Fax (334) 353-8922

# INVESTIGATIVE REPORT

**ALABAMA DEPARTMENT OF
CORRECTIONS**



**INVESTIGATION & INTELLIGENCE
DIVISION**

Confidential-For Official Use Only

Offense: Alleged Officer Misconduct          Case No.: _____     06-11070

Location: Kilby Correctional Facility      County: Montgomery   Date of Offense: 11-23-2006

| Victim(s) | Subject(s) |
|---|---|
| Inmate Jody Griffith | Gary Anderson, Correctional Officer I B/M, DOB 6-14-1975 |

## SYNOPSIS:

On 11-23-2006, inmate Jody Griffith, W/M, AIS 249169, a segregation unit protective custody inmate was ordered to the shower by Officer Gary Anderson. Officer Anderson removed inmate Griffith from the shower after a verbal dispute between the two of them. Inmate Griffith received numerous abrasions and contusions to the left side of his body from his head to his foot. Officer Anderson maintains that the inmate received those injuries by falling out of the shower and rolling on the floor.

The investigation has revealed that officer Anderson has given a signed false statement, which Officer Anderson lied about the incident. This investigation has revealed that Officer Anderson committed departmental violations and assaulted inmate Jody Griffith.

| Criminal | _____ | Non-Criminal | _____ | Internal | x_____ |
|---|---|---|---|---|---|
| Unfounded | _____ | Pending Investigation | _____ | Closed or Inactive | x_____ |
| | | Cleared by Arrest | _____ | Not Cleared | _____ |

| Copies of Report to | | | |
|---|---|---|---|
| Commissioner | _____ | Date of Report | December 13, 2006 |
| D/A | _____ | | |
| D/C | | Report Made by | Errick Demus |
| Other | Warden Holt | | |
| | | Report Typed by | Casandra Henderson |

**DETAILS:**

This investigator was asked to investigate a case at Kilby Correctional Facility involving alleged officer misconduct/unnecessary use of force on inmate Jody Griffith, W/M, AIS 249169, by Correctional Officer I Gary Anderson and Correctional Officer I Anthony Peterson. It was also stated that 8 Polaroid pictures are on file in the captain's office at Kilby Correctional Facility of the inmate's injuries for review by the investigator who is assigned this particular case. This investigation was requested by Warden Holt.

After this investigator was assigned this case, I received an incident report, which originally listed use of force and the offense of failure to obey a direct order. The suspect on the report was listed as being inmate Jody Griffith, W/M, AIS 249169. Witnesses on this report were listed as being inmate Christopher Jordan, W/M, AIS 161847, Correctional Officer I Anthony Peterson, Correctional Officer I Gary Anderson, and Correctional Officer I John Callens. The narrative of the report went on to state that on 11-23-2006, at approximately 6:05 p. m., Officer Gary Anderson notified Sergeant Allen Smith that at approximately 4:38 p. m., while conducting showering of segregation inmates, he, Officer Anderson, had removed an uncooperative inmate out of the shower on C-Block, and while doing so, the inmate had tripped over the shower threshold and fell, scratching his ankle. Officer Anderson informed Sergeant Smith that he, Officer Anderson, was going to write the inmate a behavior citation for failure to obey a direct order. Sergeant Smith informed Officer Anderson that a body chart was needed on the inmate. Officer Anderson stated that inmate Jody Griffith, W/M, AIS 249169, after being placed into the shower in C-Block, walked away from the shower gate while still wearing handcuffs, talking and making jokes. Officer Anderson ordered inmate Griffith to back up to the shower gate so that he, Officer Anderson, could remove the handcuffs from inmate Griffith. After removing the handcuffs, inmate Griffith stood inside the shower and continued to talk. Officer Anderson stated he ordered inmate Griffith to stop talking and to take his, inmate Griffith, shower. Inmate Griffith then stated to Officer Anderson, "It's my shower and bath time, which is my time". Officer Anderson instructed inmate Griffith that the shower time was for showering or he, inmate Griffith, could go back to his cell. Inmate Griffith still just stood there not showering. Officer Anderson ordered inmate Griffith to back up to the shower gate. Inmate Griffith refused to comply with the order by standing there with his, inmate Griffith, arms crossed over his chest. Officer Anderson then advised Officer Anthony Peterson that he, Officer Anderson, was opening the shower gate. Officer Anderson then opened the shower gate and entered the shower with Officer Peterson following to remove inmate Griffith from the shower. Officer Anderson attempted to secure inmate Griffith's right arm when inmate Griffith was said to have jerked away from Officer Anderson, and stated, "Get your god damn hands off me". Inmate Griffith then slipped on the wet floor and fell to the floor. Officer Anderson secured inmate Griffith's hands behind his back by placing handcuffs around inmate Griffith's wrists. Officers Anderson and Peterson then escorted inmate Griffith back to his (Griffith) assigned cell, D-4. Officers Anderson and Peterson then continued to shower the rest of the inmates assigned to the segregation unit.

At approximately 6:15 p. m., Officer Tericus Dinkins escorted inmate Griffith to the westward to receive a body chart. At approximately 6:20 p. m., inmate Griffith was treated and released by Herbert Leverette, LPN, and Alfreda Dulaney, LPN. (See attached medical report). Sergeant Smith received inmate Griffith's medical report showing only a small abrasion to the left wrist of inmate Griffith. At approximately 8:30 p. m., Officer Jenkins informed Sergeant Smith that inmate Griffith wanted to speak with Sergeant Smith. At approximately 8:35 p. m., Sergeant Smith entered the segregation unit and spoke with inmate Griffith. Inmate Griffith stated he had been assaulted for no reason by one of the segregation officers. Inmate Griffith stated he had been a correctional officer for

ten years at St. Clair Correctional Center. Inmate Griffith began showing his injuries that he received during the altercation that were not noted on the medical report and conducted on Griffith earlier to Sergeant Smith. Sergeant Smith asked inmate Griffith if there were any witnesses to the incident. Inmate Griffith stated that inmate Christopher Jordan, W/M, AIS 161847, in D-3, had witnessed it all. Sergeant Smith then questioned inmate Jordan concerning the incident. Sergeant Smith instructed Officers Anderson and Peterson to write statements, and provided inmates Griffith and Jordan with paper and pen to write statements also. At 9 p. m., Sergeant Smith notified the on-call supervisor, Captain Bolling about the incident. At approximately 9:10 p. m., Sergeant Smith had LPN Leverette report to the shift office and questioned LPN Leverette about the additional injuries that were not noted on the first medical report. LPN Leverette, at that time, stated that Griffith was uncooperative and verbally disrespectful toward him. LPN Leverette also stated that when inmate Griffith was asked where was he hurt, all that inmate Griffith showed LPN Leverette was his wrist. Sergeant Smith instructed LPN Leverette to conduct another body chart on inmate Griffith. At approximately 9:40 p. m., Sergeant Smith instructed Officer Cramer Penn to escort inmate Griffith to the segregation office where inmate Griffith received another body chart conducted by LPN Leverette. Inmate Griffith remains in the segregation unit pending disciplinary action for Rule Violation #56, Failure to Obey a Direct Order.

Sergeant Smith believes that this incident should be forwarded to the Investigations & Intelligence Division for further investigation due to the proper protocol not being followed when dealing with an uncooperative inmate in a cell, and also because of inmate Griffith's allegations.

A statement that was given by Officer Gary Anderson, and signed by Officer Gary Anderson, was also attached to this case file. Officer John Callens also gave a tape-statement, which he stated that on 11-23-2006 at approximately 2 p. m., Officer John Callens assumes duties as north control officer. At approximately 4:30 p. m., Officer Callens assisted Officer Gary Anderson and Officer Anthony Peterson in conducting D-Block showers. At approximately 4:45 p. m., while observing Officer Peterson on D-Block, Officer Callens heard Officer Anderson giving an inmate several orders to exit the shower on C-Block. Officer Callens did not witness any further action. That statement was signed by Officer Callens.

The original statement that was done by Officer Anthony Peterson, in which, he stated that on 11-23-2006 at approximately 4:30 p. m., Correctional Officers Gary Anderson and Anthony Peterson placed inmate Jody Griffith into the shower. Officer Anderson gave inmate Griffith several orders, which he, Griffith, didn't comply. Officer Anderson then left the shower and turned off the shower. Officer Anderson returned and gave inmate Griffith a direct order to exit the shower again and inmate Griffith did not comply. Officer Anderson advised Officer Peterson that he was opening the shower door. Officer Anderson then entered the shower with Officer Peterson behind him. As Officer Anderson grabbed inmate Griffith's right wrist, he, Griffith, jerked away stating, "Get your god damn hands off me". At that time, inmate Griffith fell to the floor. Correctional Officers I Gary Anderson and Anthony Peterson escorted inmate Griffith back to his assigned cell, D-4. This statement was not signed by Correctional Officer Anthony Peterson.

This investigator also received a second statement from Correctional Officer Peterson, which was signed by Officer Peterson. In that second statement, Officer Peterson stated that at approximately 4:15 p. m., on 11-23-2006, I, Officer Anthony Peterson, was on D-Block conducting showers. I, Officer Peterson, did not witness the altercation between Correctional Officer Gary Anderson and inmate Jody Griffith that occurred on C-Block of the segregation unit.

This investigator had previously spoken with Captain Barrett, and Captain Barrett stated that the reason that Officer Anthony Peterson did not want to sign his original statement because he advised Captain Barrett that the original statement was not true, and that he was not going to sign it, because he did not want to get himself in any trouble and implicate himself in any way in this matter concerning inmate Jody Griffith and Officer Gary Anderson.

This investigator was also given a handwritten statement by inmate witness Christopher Jordan, W/M, AIS 161847. In inmate Jordan's statement, he stated he and Jody Griffith were in the shower at the same time. Inmate Jordan stated that the officer conducting the showers, told or asked Jody, who was talking, to quit talking, and asked Jody to grab his shit and get out. Jody was drying off when the officer cut off the shower and then threw the door open. The door slammed into Jody. The door hit him in the side of the head. The officer stepped into the shower, hitting him in the leg with his stick, grabbed him by the back of the neck, and threw him down, slamming him down on his face. I was then ordered to get out. Cooperating, I did what I was told and returned to my cell. This was signed, inmate Christopher Jordan.

This investigator also received a handwritten statement from inmate Jody Griffith, W/M, AIS 249169, which is a two page statement. He stated that on 11-23-2006, during second shift, he was placed in handcuffs and directed to the shower area. Inmate Griffith stated that upon arriving at the shower area, he was ordered by Officer Gary Anderson to enter the shower, along with inmate Chris Jordan, because he stated that both of them were in protective custody. After approximately 3 minutes, inmate Griffith stated that the officer stated, "You can not talk and shower at the same time". Inmate Griffith stated, " I am shower", and placed his head back under the water. At that point, inmate Griffith stated that the officer made the statement, "Waldo, get your ass out of the shower". Inmate Griffith stated he asked if he could finish, and he walked to the corner of the shower and began drying off. Inmate Griffith stated that the officer slammed the door open on him while he was drying off, and the door hit him, and then the officer drew his baton and hit him in the leg, and told him to get the fuck out of the shower. Inmate Griffith stated that the officer then hit him, but he does not remember where. He stated he was lying on the floor and the officer began poking him with his baton stating, "Take your ass back to your cell". Inmate Griffith stated he was finally able to limp to his cell where he informed another officer in the unit that came by that he needed to go to the infirmary for a body chart to be conducted. Inmate Griffith stated he informed Officer Dinkins on the way back to his cell after the body chart was conducted that he wanted to talk to a supervisor because he felt that the body chart was insufficient. He stated he got a chance to look at the body chart, and no documentation of his injuries was noted on the body chart. Inmate Griffith stated that Sergeant Smith later came by his cell, and he explained the incident and showed him all his injuries. He stated that Sergeant Smith then ordered him to be taken back to the infirmary for a second body chart.

The original body chart that was done on inmate Jody Griffith on 11-23-2006 at 6:20 p. m. only reflected injuries to the right wrist area of inmate Griffith. It was said to be a small abrasion, but no other injuries noted at that time. A second body chart was done on inmate Jody Griffith, which the examination showed the following:

1. The inmate was alert and oriented to person, place, and time.
2.  respiratory with ease
3. skin warm and dry and in tact
4. minor abrasions noted with no bleeding
5. abrasions noted to the third toe on the left foot
6. abrasions noted to the left posterior thigh

7. a bruise to the left lateral hip
8. a bruise to the left interior hip
9. a bruise to the left lateral shoulder
10. an abrasion to the left inferior forearm
11. small abrasion to the left wrist
12. a left lateral head abrasion
13. an abrasion to the left eyebrow

This second body chart was done at 9:40 p. m. by LPN Leverette, copies of which will be added to this case file.

After being assigned this case, this investigator traveled to Kilby Correctional Facility, and at that time, I received 11 photographs that were taken on the day after this offense occurred of the inmate's injuries. These photographs were taken on 11-24-2006. I also received 6 other photographs that were taken on 11-27-2006 of inmate Jody Griffith's injuries. These will also become part of the case file. It should further be mentioned that these photographs show injuries to the inmate's left scalp, left shoulder, left hip, behind the left leg, left wrist area, and a mark or bruise over the left eye.

This investigator interviewed inmate Jody Griffith, W/M, AIS 249169, DOB 9-11-1971. In that interview, I obtained a detail statement from inmate Jody Griffith, in which, he advised that on the date of this offense, he stated he showered with inmate Christopher Jordan, that they were instructed to take a shower at the same time because they were both protective custody inmates. Inmate Jody Griffith stated he was talking, at which time, Officer Anderson asked him not to talk and go ahead and complete his shower. Inmate Griffith stated he continued to talk to inmate Christopher Jordan, but he also continued to take his shower. Inmate Griffith stated that at that time, the officer threatened to take him out of the shower. Inmate Jody Griffith stated that the next thing he knew, the officer slammed the door open, and the door hit him on his left side of his body. Inmate Griffith stated that at that time, the officer hit him on the back of his leg with his baton. Inmate Griffith stated that all he remembers doing is falling out. He stated that the officer may have hit him several more times, but he could not remember, and he stated he lost consciousness for a short period of time. Inmate Griffith stated he remembers when he woke up, that the officer was calling him a bitch and telling him to get back to his assigned cell. Inmate Jody Griffith stated he could not move at that time and had trouble moving. Inmate Griffith stated he was finally able to make it back to his cell, at which time, he was able to get another officer's attention and request a body chart. He stated that after he was taken for his first body chart, nothing was documented on that particular chart. He stated he sent word to have Sergeant Smith come and speak with him concerning this. He stated that after Sergeant Smith arrived at his cell in the segregation unit, he showed Sergeant Smith the injuries that he received during this incident with Officer Gary Anderson. Inmate Jody Griffith stated he wished for another body chart to be conducted so that these injuries could be noted. Sergeant Smith then ordered another body chart on inmate Jody Griffith at that time. Also, at that time, inmate Griffith stated that there was a witness to this offense, which was inmate Christopher Jordan. Inmate Christopher Jordan did in fact give a statement at that time.

This investigator next obtained a detail statement from inmate Christopher Jordan, W/M, AIS 161847, DOB 11-4-1970. Inmate Christopher Jordan stated he was in fact in the shower with inmate Jody Griffith because they were both protective custody inmates. Inmate Jordan stated that there were some words being passed between inmate Griffith and Officer Gary Anderson. Inmate Jordan stated that the next thing he knew, Officer Gary Anderson swung the door open real forcefully, and the door hit inmate Jody Griffith in the side, and the officer then immediately stepped into the shower

and swung his baton and hit inmate Griffith in the back of his leg. Inmate Jordan stated that the inmate then went down to the ground. He stated that the inmate struck his face on the ground, and the officer then started calling the inmate a bitch and told him to get back to his assigned cell. Inmate Christopher Jordan's statement is self-explanatory and will be added to the case file.

It should further be mentioned that inmate Christopher Jordan also stated that there is another possible witness to this offense, which was an inmate by the name of Kenny Smith. This investigator located inmate Kenny Smith, who was in the segregation unit in Cell #D1. Kenny Smith was identified as a black male, AIS 193444, and DOB is 1-15-1969. At that time, inmate Kenny Smith stated he did not see or hear anything and did not know anything about this assault and refused to cooperate in any way concerning this investigation. That interview was then terminated.

This investigator then located Officer Tericus Dinkins, B/M, DOB 5-13-1972, and address 4710 Parktown Way, Apartment 238, Montgomery, Alabama, 36116. His phone number was said to be (334) 451-7999. In interviewing Officer Tericus Dinkins, he stated he was instructed by Sergeant Smith to take inmate Jody Griffith for a body chart. While Officer Dinkins was taking inmate Griffith for a body chart, inmate Griffith stated that he, Griffith, had received a common coronial shot to his left leg from Officer Gary Anderson. Officer Dinkins stated he asked inmate Griffith how he knew anything about a common coronial shot. At that time, Officer Dinkins stated that inmate Griffith stated that he was a correctional officer for ten years at St. Clair Correctional Facility. In further speaking with Officer Dinkins, he stated he did in fact observe the injury to the leg of inmate Griffith, and that inmate Griffith showed him his injuries at that time when the first body chart was being conducted. He also showed this injury to Nurse Alfreda Dulaney. Officer Tericus Dinkins' statement is self-explanatory and will be added to the case file.

This investigator then obtained a tape-statement from Alfreda Dulaney, LPN, B/F, DOB 10-2-1977, address 2504 McGraw Court, Montgomery, Alabama, 36116, and phone number is 356 5152. In Alfreda Dulaney's statement, she advised that she handled the initial phase of the body chart on inmate Griffith. Nurse Dulaney further stated that when the inmate first arrived in the healthcare unit. He did show her, as well as Officer Tericus Dinkins, his injuries to his left hip, left forearm, and also stated to her that he had trouble hearing out of his left ear. Also, Nurse Delaney stated that the inmate asked her if there was something wrong with the left side of his head. At that point, LPN Delaney stated she advised the inmate that he had a red mark over his left eye, which she stated she observed. Nurse Delaney further stated she also redness to inmate Griffith's scalp area. Nurse Delaney stated that inmate Griffith mentioned that he had received a common coronial shot to his left leg. Nurse Delaney stated she thought this was unusual for an inmate to be talking in those terms, and she asked the inmate how did he know about that, and the inmate told her that he was once a correctional officer at St. Clair Correctional Facility for ten years before being incarcerated. Nurse Delaney's statement is self-explanatory and will be added to the case file.

On Thursday, December 7th, 2006, at approximately 8 a. m., this investigator interviewed Officer Anthony Peterson, B/M, DOB 1-28-1973, address is 7064 Taylor Road N., Apartment H, Montgomery, Alabama, 36117, and his phone number is 279-5593. In interviewing Officer Peterson, he stated that the first statement that was written was untrue, and he stated he did not sign this particular statement because it was untrue. Officer Anthony Peterson stated that this statement was on the shift clerk's (Miss Cynthia Butler) desk in the shift office, and he stated that when he read this statement, he noticed that there were some untruths in this statement and he decided not to sign the statement. At that time, Officer Peterson stated he brought this to the attention of Sergeant Smith, and at that time, Officer Peterson was instructed to write another statement. Officer Anthony

Peterson stated he then wrote another statement, and in that particular statement, he stated that at approximately 4:15 p. m. on 11-23-2006, during the time of this offense, he, Correctional Officer Peterson, was on D-Block conducting showers. Officer Peterson stated he did not witness the altercation between Correctional Officer Anderson and inmate Jody Griffith that occurred on C-Block of the segregation unit. That statement was signed by Correctional Officer Anthony Peterson. Officer Peterson stated that this is a correct representation of what he knows transpired between Officer Anderson and inmate Griffith. Officer Peterson stated he was on the top tier in the segregation unit and did not see or hear anything concerning what happened between inmate Griffith and Officer Anderson. Officer Anthony Peterson's statement is self-explanatory and will be added to this case file.

At approximately 9 a. m., on Thursday, December 7, 2006, this investigator interviewed Officer Gary Anderson, B/M, and DOB 6-14-1975. His address was given as being 863 Grege Drive, Montgomery, Alabama, 36109, and his phone number is 396-8050. In interviewing Officer Gary Anderson, he adamantly denied striking or ever hitting inmate Jody Griffith while allowing inmate Griffith to take a shower in the segregation unit. Officer Anderson further stated that Sergeant Smith ordered him (Anderson) to give a statement, and the statement should include two officers' names in the statement. Officer Anderson stated that because of that order, he gave a false statement with Officer Peterson's name mentioned throughout the statement. Knowing that the statement was false, Officer Gary Anderson stated he then signed this statement because he was instructed to give this statement with another officer's name in it by Sergeant Allan Smith. Officer Anderson advised that he never assaulted inmate Griffith with a baton or anything else. Officer Anderson stated that inmate Griffith fell out of the shower onto the floor of the segregation unit and rolled, and this is how the inmate received his injuries. Officer Anderson further advised that he does not know how inmate Griffith received injuries to the left side of his head, left side of his eye, left shoulder, left side, left wrist, and the left rear thigh area.

It should further be mentioned that Officer Gary Anderson stated he was ordered to give this statement with two officers' names in it in the presence of Officers Peterson and Dinkins. He stated this order was given in the segregation office, and they were the only officers present as stated by Officer Gary Anderson. Officer Gary Anderson also stated he did not slam the door into inmate Griffith when he opened the shower door to extract inmate Griffith from the shower.

On Thursday, 12-7-2006, this investigator contacted Officer Dinkins by phone and asked him if he was in fact in the segregation office in the presence of Sergeant Smith and Officer Peterson when Sergeant Smith made a statement to Officer Anderson to place two officers' names in Officer Anderson's statement. At that time, Officer Dinkins stated he did not actually remember Sergeant Smith saying that two officers' names needed to be in the statement, but Sergeant Smith did state to Officer Anderson that the statement had to be good, and to make the statement good. Officer Dinkins further stated that he remembered Sergeant Smith making the statement that he knew that he (Sergeant Smith) was going to have to take the blame and bite the bullet for not having three officers in the segregation unit to conduct the shower to avoid this incident from occurring. This investigator then ended that conversation with Officer Dinkins.

On 12-11-2006, this investigator obtained a statement from Sergeant Allen Smith, W/M, DOB 12-1-1965, address 108 Hickory Road, Deatsville, Alabama, 36022, and phone number (334) 207-1846. Sergeant Smith advised that he did not tell Officer Anderson to put two officer's names in his statement. Sergeant Smith stated he only advised Officer Anderson to tell the truth.

On 12-21-2006, this investigator obtained a follow-up statement from Officer Anthony Peterson. Officer Peterson advised that while in the segregation office, he (Peterson) heard Sergeant Smith advised Officer Anderson to tell the truth in his statement. Officer Peterson also advised that he never heard Sergeant Smith tell Officer Anderson to place two officer's names in his statement.

This concludes this investigation. This report will be forwarded to Warden Holt for administrative actions against Officer Gary Anderson.

Errick Demus, Investigator
Alabama Department of Corrections
Investigations and Intelligence Division

ED/ch

FROM :KILBY WARDEN'S OFFICE          FAX NO. :334-215-6606          Nov. 28 2006 12:57PM P5




HCP 1062 B


PHS
PRISON HEALTH SERVICES



# EMERGENCY

| ADMISSION DATE 11/23/06 | TIME 6:10 AM | ORIGINATING FACILITY ___ KCF ___  ☐ SIR ☐ PDL ☐ ESCAPEE ☐ ___ | ☐ SICK CALL ☐ EMERGENCY ☐ OUTPATIENT |
|---|---|---|---|

| ALLERGIES NKA | | CONDITION ON ADMISSION ☐ GOOD ☐ FAIR ☐ POOR ☐ SHOCK ☐ HEMORRHAGE ☐ COMA |
|---|---|---|

O₂ Sat 98%

| VITAL SIGNS: TEMP 98.6 | ORAL/RECTAL | RESP. 20 | PULSE 103 | B/P 142/90 | RECHECK IF SYSTOLIC <100> 50 ___ / ___ |
|---|---|---|---|---|---|

**NATURE OF INJURY OR ILLNESS**

Body Chart Per DOC

3 = was assaulted by
O DOC officer

| ABRASION /// | CONTUSION # | BURN xx xx | FRACTURE Z Z | LACERATION / ___ SUTURES |
|---|---|---|---|---|

PROFILE RIGHT OR LEFT

RIGHT OR LEFT

**PHYSICAL EXAMINATION**

O- Alert & Oriented to person, place, and time
Resp. with ease. Skin warm, dry, and intact
Small abrasion to left wrist, no bruises, no
cuts, no distress noted

A- body chart per ADOC

P- Release to ADOC

| ORDERS / MEDICATIONS / IV FLUIDS | TIME | BY |
|---|---|---|
| | | |

**DIAGNOSIS**

**INSTRUCTIONS TO PATIENT**

| DISCHARGE DATE 11/23/06 | TIME 6:20 AM | (RELEASE) TRANSFERRED TO ☐ DOC ☐ AMBULANCE ☐ | CONDITION ON DISCHARGE ☐ SATISFACTORY ☐ POOR ☐ FAIR ☐ CRITICAL |
|---|---|---|---|
| NURSE'S SIGNATURE | DATE 11/23/06 | PHYSICIAN'S SIGNATURE | DATE | CONSULTATION |

| INMATE NAME (LAST, FIRST, MIDDLE) Griffith, Jody | DOC# #249169 | DOB 9/11/71 | R/S W/M | FAC. KCF |
|---|---|---|---|---|

FROM :KILBY WARDEN'S OFFICE          FAX NO. :334-215-6606          Nov. 28 2006 12:57PM  P6



KCF 1062 B

# EMERGENCY

| ADMISSION DATE 11 /23 /06 | TIME 9:25 AM | ORIGINATING FACILITY Kilby ☐SIR ☐PDL ☐ESCAPEE | ☐ SICK CALL   ☐ EMERGENCY ☐ OUTPATIENT |

| ALLERGIES NKA | CONDITION ON ADMISSION ☑GOOD  ☐FAIR  ☐POOR  ☐SHOCK  ☐HEMORRHAGE ☐COMA |

| VITAL SIGNS: TEMP 99.3  ORAL RECTAL  RESP. 20  PULSE 96  B/P 140/76  RECHECK IF SYSTOLIC <100> 50 |

| NATURE OF INJURY OR ILLNESS | ABRASION /// | CONTUSION # | BURN XX | FRACTURE Z | LACERATION / SUTURES |

S-2nd body per ADOC



PROFILE RIGHT OR LEFT



RIGHT OR LEFT

**PHYSICAL EXAMINATION**

O-Alert and oriented to person, place, and
time. Resp. with ease. Skin warm, dry,
and intact only. On second exam
minor abrasion noted with no bleeding
noted as follows. <1cm on 3rd toe left
foot, Left posterior thigh 5cm bruise, 4
cm bruise left lateral hip, 3cm bruise left
anterior hip, 3cm bruise left lateral shoulder,
5.5 cm abrasion left inferior forearm. Small
abrasion left wrist, <1cm abrasion left
lateral head, <1cm scrape left eyebrow. no
distress noted

| ORDERS / MEDICATIONS / IV FLUIDS | TIME | BY |
| | | |

**DIAGNOSIS**
A- body chart per ADOC

**INSTRUCTIONS TO PATIENT**
P- Release to ADOC

| DISCHARGE DATE 11 /23 /06 | TIME 9:40 AM | RELEASE / TRANSFERRED TO ☑ADOC ☐AMBULANCE | CONDITION ON DISCHARGE ☑SATISFACTORY  ☐POOR ☐FAIR  ☐CRITICAL |

| NURSES SIGNATURE  DATE 11/23/06 | PHYSICIAN'S SIGNATURE | DATE | CONSULTATION |

| INMATE NAME (LAST, FIRST, MIDDLE) Griffith, Jody | DOC# 249169 | DOB 9/11/71 | R/S W/M | FAC. KCF |

WHITE - Record Copy  Yellow - Pharmacy Copy

FROM :KILBY WARDEN'S OFFICE          FAX NO. :334-215-6606          Nov. 28 2006 12:57PM  P4

KCf 1062 B

ALDOC Form 225B

## ALABAMA DEPARTMENT OF CORRECTIONS
### DISCIPLINARY REPORT

1. Inmate: **Jody Griffith**          Custody: _____          AIS: **W/M 249169**

2. Facility: **KILBY CORRECTIONAL CENTER**

3. The above named inmate is being charged by **COI Gary Anderson** with violation of rule number **#56** specifically **Failure to Obey a Direct Order** from regulation # **403** which occurred on or about **11/23**, 20**06** at (time) **4:38pm** (am / pm), Location: **Segregation shower** . A hearing on this charge will be held after 24 hours from service.

4. Circumstances of the violation(s) are as follows: **On 11/23/06 at approximately 4:38pm you inmate Jody Griffith W/M 249169 did refuse to comply with COI Gary Anderson order to back up to the shower gate to be handcuffed. By doing so you are in violation of rule #56 Failure to Obey a Direct Order.**

_____          _____
Date                                                      Arresting Officer / Signature / Rank

5. I hereby certify that I have personally served a copy of the foregoing upon the above named inmate and I informed inmate of his/her right to present a written or oral statement at the hearing and to present written questions for the witnesses on this the _____ day of _____, 20___ , at (time) _____ (am/pm).

_____          _____
Serving Officer / Signature / Rank                    Inmate's Signature / AIS Number

6. Witnesses desired?          NO _____          YES _____
                                              Inmate's Signature                              Inmate's Signature

7. If yes, list: _____
_____

8. Hearing Date _____          Time _____          Place _____

9. Inmate must be present in Hearing Room.  If he/she is not present explain in detail on additional page and attach.

10. A finding is made that inmate (is / is not) capable of representing himself.

_____
Signature / Hearing Officer

11. Plea: _____ Not Guilty          _____ Guilty

12. The Arresting Officer, Inmate, and all witnesses were sworn to tell the truth.

_____
Signature / Hearing Officer

Annex C to AR 403  (Page 1 of 5)

*Casefile #*
*SCAN*
*Page 1 of 2*

**Carr, Betty (DOC)**

| | |
|---|---|
| **To:** | Yarbrough, Paul (DOC) |
| **Cc:** | Holt, Arnold (DOC) |
| **Subject:** | KCF 1062 Incident Report - Request an investigation |

I am requesting an investigation into the incident regarding the use of force on Inmate Jody Griffith, 249169, by CO I Gary Anderson and CO I Anthony Peterson. 8 polaroid pictures are on file in the Captain's Office of the inmate for review by the investigator you assign to this case.

Arnold M. Holt
Warden III

*Approved*
*11/29/2006*
*P. Yo*

1

### STATEMENT OF COI GARY ANDERSON

The following will be a tape-statement.  This statement will be taken from Officer Gary Anderson.  He'll be a black male.  His date-of-birth will be 6-14 of 1975.  His address will be 863 Greg G-R-E-G Drive, Montgomery, Alabama, 36109, and his phone number will be 396 8050.

ED    If you will, Officer Anderson, will you tell me if you were working at Kilby Correctional Facility on 11-23-2006?

GA    Yes

ED    In what capacity were you working?

GA    Correctional Officer I

ED    Uh, in what area of the prison were you working in?

GA    Segregation Unit

ED    Uh, and what were your duties at that time in the segregation unit?

GA    All of them, uh, I, (inaudible)

ED    At the time of this incident, what were (inaudible)?

GA    Oh, oh, we were showering.

ED    You were showering inmates?

GA    Yes

ED    Okay, do you remember having an incident with inmate Jody Griffith?

GA    Yes

ED    Okay, can you tell me what happened during that incident?

GA    Uh, around four thirty something, uh, inmate Griffith

ED    That's 4:30 p. m.?

GA    Oh, yes, it's gonna be in the p. m.

ED    Okay

GA    (inaudible), uh, inmate Griffith was then placed in the shower by myself, by Officer Anderson, and

ED    Officer Anderson was present?

GA    Myself, I'm Officer Anderson.

ED    Okay, you're Officer Anderson, okay.  Go ahead.

GA    Uh, by myself, I placed him in the shower, I locked the door, he walks away from the door.  As I put the key up, I say, hey, man, you need to get back over here and, and, uh, (inaudible) me remove your cuffs so you can get to showering.  He study talking as if he didn't hear me.  I say, hey, you gonna shower now, talk later, now get back over to the door.  He turns and says to me, this is his shower and bath time, which is his free time.  And I, I told him I don't know where he got that from because down here you either shower or you go back to your cell, and he just stood there and looked at me.  So I said, alright, well you going back to your cell.  I go.  I turn the water off.  I tell the inmate to get back over to the door.  He still won't move.  I popped the lock to the door.  I stepped inside.  I said, man, get out of this shower.  He just looks at me.  I grab him around his elbow and arm, I guess it was close to the forearm, and I start to pull him out the shower.  Now, he just leaning.  He's not like pulling away, he's leaning.  I said, man, you gonna get your ass out this shower.  He said get your god damn hands off me, and I pulled him anyway.  Now I could have, uh, maybe I should have spoke some more, but I pulled him on out the shower.  As I'm coming over, I'm expecting him to step over, he doesn't.  Let go.  He hits the concrete and rolls.

ED    He hits the concrete and rolls?

GA    Uh huh

ED    Okay, did you ever hit the inmate?

GA    Negative, no.

ED    Did you have a baton?

GA    No

ED    Okay, Officer Anderson, uh, you gave a statement on, uh, November 23, 2006, uh, in which you signed the statement, uh, to give the details of the offense.

GA    Yes

ED    Uh, and in that particular statement, you mentioned that Officer Peterson was present with you when this incident occurred?

GA    Yes

ED    Is that statement true?

GA    No

ED    Why is it not true?

GA    Sergeant Allen Smith advised myself, Officer Anderson, that's myself, Peterson, and Dinkins was in the office when he told us, well, he told, talking to me that two people had to be in the statement. So I wrote my statement according to like SOP procedures and putting Peterson in the statement.

ED    Okay

GA    Now, both of these statements was signed. His too. But apparently, at some point, he went, redid

ED    His, his, whose, whose statement was signed?

GA    That night, Peterson and I both did a statement.

ED    That is correct.

GA    And both signed off on it.

ED    Okay

GA    Now, I get, I don't get to go back inside the camp. I'm on the tower. At some point, it gets back to me that Peterson went and said that he was changing his statement. So I wanted to go up front and tell him too because

ED    Okay, let's get back to your statement right now.

GA    Okay

ED    In this particular statement, you mentioned that Officer Peterson was present with you during this offense. And you stated that this is not true?

GA    That is not true. He was not there. He was on the (inaudible).

ED    Why did you sign this statement if it was untrue?

GA    I was, I was instructed to.

ED    You was instructed to sign a, a false statement? A statement that was not true?

GA    True, right, to write a statement with two officers in it.

ED    You were, okay, exactly what were you told to do?

GA    Write a statement. I, he wanted two officers in the statement and to turn the statement in to him.

ED    Okay, and is that why you wrote the statement with Officer Peterson's name it?

GA    Yes

ED    Even though Officer Peterson was not present?

GA    That is correct.

ED    So Officer Peterson was not present during the time, uh, of this offense as this statement has indicated?

GA    Right, that is correct.

ED    And you signed this statement knowing that it was untrue?

GA    Yes

ED    And who did you give that statement to?

GA    The same supervisor who instructed me to write the statement with two people in it.

ED    And that was

GA    Sergeant Smith

ED    And that was Sergeant Allen Smith?

GA    Sergeant Allen Smith

ED    Okay, uh, Officer, uh, Anderson, did you in fact assault inmate Jody Griffith?

GA    No

ED    Did you ever strike inmate Griffith at any point?

GA    No

ED    Have you told the complete truth in this statement? Have you told the complete truth in this statement?

GA    That I'm giving you, yes.

ED    Okay, okay, Officer Anderson, inmate Griffith, Griffith received injuries to his head.  How did he, how, how did the inmate receive injuries to his left side of his head?

GA    I'm assuming he hit the floor.

ED    Okay, the inmate also received injuries to, over his left eye.  Do you know how he received those?

GA    I can only assume on the floor.

ED    Inmate also shown injuries to his left side of his body, on the left hip area and left side.  How do you, do you have any explanation on how he received those?

GA    I can only assume the floor again.

ED    Okay, the inmate also had a common coronial shot to the rear of his left leg.  Do you have any idea on how the in, in, inmate received that injury?

GA    No

ED    Is that a standard, uh, place where inmate will be struck by an officer after an inmate is, uh, resisting or is that a common area that officers are taught to strike an inmate with a baton in the academy?

GA    No, it's higher around the top part of the muscle.  I would say that.

ED    But in that general area?

GA    Yeah, in that general, oh, you just saying the leg?

ED    Yes

GA    Okay, well, yeah, sure.

ED    Okay, uh, inmate also received a, uh, abrasion to his shoulder.  Do you have, have any, to his left shoulder?  Do you have any idea on how he received that?

GA    Left shoulder, I'm assuming the floor again.

ED    And also, the inmate received injuries to his left wrist area.

GA    That could have been me with the cuffs.

ED    Okay, and it's your, uh, testimony that you did not strike this inmate at any time?

GA    That is correct.

ED    Okay, Officer, uh, Anderson, would you be willing to take a polygraph test concerning, uh, what you just stated in this statement?

GA    Yes

ED    Okay, uh, have you told the complete truth in this statement?

GA    Yes

ED    Is anything else that you'd like to add to this statement?

GA    No

ED    Okay, Officer, uh, Anderson, uh, did you, uh, open the door to the shower cell without another officer being present?

GA    Yes

ED    Okay, is that a violation of departmental duties, uh, regulations?

GA    Yes

ED    Okay, Officer, uh, Anderson, did you in fact order the inmate back to his cell after this incident instead of taking the inmate to the infirmary?

GA    Yes, that is where I took the inmate and I said that too.

ED    You said what?

GA    You're going back to your cell.

ED    Okay, is it departmental regulations to have a, any time an in, an inmate falls, uh, in your presence or, uh, receives any type of injuries to have that inmate taken to the infirmary for a body chart?

GA    Yes, and that's what happened.

ED    Okay, but was he immediately taken there?

GA    No

ED    Why was it delay?

GA    I still had inmates out in the shower.  We were the only two back there.  There was no way that we could have got them without, we had to at least get them out the shower first before we could take him anywhere.

ED    At that time, did you immediately notify your supervisor that an inmate possibly received injuries?

GA    Yes, I also told him I was writing the inmate up for disobeying a direct order.

ED    Okay, who did you tell that to?

GA    Sergeant Allen Smith

ED    And that was right after this incident occurred?

GA    Yes

ED    Okay, okay, alright, uh, Officer Anderson, is anything else you'd like to add to this statement?

GA    (inaudible), uh, only that I know I violated the SOP rules and regulations by opening the shower by myself, but it is common practice amongst the seg officers that, because we only have enough men for one man at each shower to open the door, put inmate in, and then also take the inmate out.  We only have three officers.  One will be at each shower, and the other one will be on the tier.

ED    Okay, anything else?

GA    No

ED    This will conclude the tape-statement taken from, uh, Officer Gary Anderson.  End of statement, Investigator Errick Demus

ED/ch

## STATEMENT OF COI TERICUS DINKINS

The following will be a tape-statement.  This statement will be taken from Officer Tericus T-R-I-C-U-S Dinkins D-I-N-K-I-N-S.  He'll be a black male, date-of-birth will 5-13 of 1972.  His address will be 4710 Parktown Way, Apartment 238, Montgomery, Alabama, 36116.  His phone number will be area code (334) and the number is 451 7999.

ED    If you will, inmate Tericus Dinkins, tell me what you know about this alleged assault on inmate Jody Griffith, which was said to have occurred on 11-23-2006 at, uh, Kilby Correctional Facility.

TD    On the day in question, I was assigned as seg rover, but I was moved by Sergeant Alex Smith to the kitchen around 2:30, 2:40, to assist with chow.  Uh, the incident happened down there, I wasn't there, present at the time.  Only thing I, Officer Dinkins did was escort inmate down to westward around 6:20 for a body chart.  Uh, the individual started describing one of the shots to his leg as a (inaudible).

ED    Okay, when you say the individual, who are you talking about?

TD    Individual Jody, uh, Griffin, white male, 249169.  He started describing one of the shots to his left leg if I'm not mistaken as a common coronial shot.  Uh, Officer Jenkins asked him what did he know about a common coronial shot.  The in, uh, inmate Jody Griffin stated that he was a correctional officer ten years at St. Clair and he knew what a common coronial shot was.  That is all I can tell you about the incident because I, Officer Dinkins, did not witness anything.

ED    Okay, did you seen this common coronial shot to the leg?  Did you see the injury?

TD    I saw what appeared to be a shot.  He pointed to the place where he say the alleged incident happened.

ED    Uh, okay

TD    (inaudible)

ED    Was his leg covered or uncovered at that time?

TD    It was, it was uncovered because he did pull his pants down.  Tried to pull his pants down to show where he was shot.

ED    And who did he show that too?

TD    He was showing it to Nurse Dulaney.

ED    He did show that to Nurse Dulaney?

TD    He tried to show it to Nurse Dulaney. Well, she was doing the body chart and he was showing the spots that he say he was hit at, in the area he was hit.

ED    Okay, did he have any other, did he show any other bruises or injuries to his person at that time?

TD    Uh, no, I can't recall if he did or not.

ED    Did he say how he received that shot to the leg?

TD    He said the officer had inflicted these wounds upon him.

ED    Did he say which officer?

TD    He stated Officer Anderson.

ED    Okay, uh, did inmate, uh, Griffith, uh, say why this occurred?

TD    No, he didn't. No, he didn't, because I didn't ask any questions. I didn't hear the nursing staff ask him any questions on how they had happened.

ED    Okay, uh, but the inmate did point this bruise out to

TD    He did point this bruise out to me and Officer Jenkins.

ED    Exactly where was that bruise at? Tell me that.

TD    He say on the back of his left thigh if I'm not mistaken (inaudible).

ED    Okay, and did you see a bruise at that time?

TD    Uh, I saw a red spot. That's about it.

ED    Okay, alright, uh, who was, who else was present in the, uh, westward infirmary when you got there when inmate Griffith was showing this injury?

TD    Me and Officer Jenkins, Kenneth Jenkins was the officer assigned to that ward at the time. It was me and Officer Jenkins, Nurse Dulaney. I can't recall anybody else that was sitting down in that particular area while she was doing the body chart. Uh, I noticed later on that, uh, Nurse Leveret did show up from his break or while he was still on his break.

ED    Okay

TD    And, uh, when he got there, he asked Miss, Miss, uh, Dulaney what did she have and she was telling him that she was doing a body chart. And so he asked the inmate something. The inmate smart off to him and, uh, he asked him, inmate Griffin asked

who was doing the body chart. And Miss Dulaney said, well, she was doing it, but he's gonna finish it out, speaking of Mr. Leveret.

ED      Mr. Leveret said he would finish it out.

TD      Right

ED      Okay, but Miss Dulaney started the body chart.

TD      That is correct.

ED      Is that correct?

TD      That's correct.

ED      Okay, alright, uh, Officer Dinkins, uh, is anything else you can remember concerning this case?

TD      No sir, nothing else concerning (inaudible).

ED      Okay

TD      After then, I took him back to the ward after the in, the body chart was completed.

ED      Okay, after it was completed?

TD      Right

ED      You took him back? Did you subsequently take him on, for his second body chart?

TD      No, what happened was, uh, me and Sergeant Smith went up to the block, because, uh, the inmate wanted to talk to Sergeant Smith. So Sergeant Smith did come down, I want to say about ten minutes until nine, if not nine o'clock, went up to the individual cell. He was in Bravo B, Delta 4. We talked to him and the individual stated, individual meaning by inmate Griffin, stated that he had been assaulted by an officer. And, uh, said that he didn't think the body chart was done accurate at the time. He said if you look at the body chart, he don't believe none of the bruises that he showed would be on there.

ED      Okay

TD      And so, at that time, I say about 9:30, Sergeant Smith ordered Nurse Dulaney, Mr. Leveret back down to the ward to do another body chart.

ED      Okay, alright, alright, anything else you'd like to add?

TD      (inaudible)

ED    Okay, this will conclude the tape-statement taken from Officer Tericus Dinkins.  End of statement, Investigator E. S. Demus

ED/ch

## STATEMENT OF ALFREDA DULANEY, LPN

The following will be a tape-statement. This statement will be taken from LPN Alfreda Dulaney D-U-L-A-N-E-Y. She'll be a black female. Her date-of-birth will be 10-2of 1977. She'll be 29 years of age. Her address will be 2904 McGraw M-C-G-R-A-W Court, Montgomery, Alabama, 36116m, and her phone number will be 356 5152.

AD     Okay

ED     If you will, Miss Dulaney, will you tell me if you were working on the night of, uh, November the 3, November the 23, 2006, here at the Kilby Correctional Facility?

AD     Yes, I was working.

ED     Were you in the infirmary at that time?

AD     I was working

ED     Westward

AD     population, but I had just taken a break from pop and I had walked down to westward.

ED     Okay, uh, do you remember an Officer Tericus Dinkins bringing an inmate in for treatment?

AD     Yes

ED     Or for a body chart?

AD     Yes

ED     Do you remember that inmate's name?

AD     Uh, Griffith, Jody, Jody Griffith

ED     Was it, was it Jody Griffith?

AD     Yes

ED     Tell me what happened during that, during that, uh, interview or what happened during that time.

AD     Okay, uh, Officer Dinkins brought him down, and normally, like I say, the CNA gets the body chart started, but she was on break.

ED     Okay

AD    So I went ahead and

ED    And the CNA is who?

AD    Uh, Jerelda Rugly

ED    What does the CNA stand for?

AD    Uh, certified nursing assistant

ED    Nurses assistant?

AD    Right

ED    But she was on break?

AD    Right

ED    So you started the body

AD    But I told her I would go ahead and get it started.

ED    You started the body chart?

AD    Right

ED    Okay, what happened when you started this body chart?

AD    Uh, usually standard procedure, get the vital signs and then we have to do like a (inaudible), you know, you ask what happened. And I asked him, you know, what happened, but I guess I might have said it, used the wrong wording, because I meant, you know, what happened as far as like the, what are your injuries, but he said, uh, something to the affect of I don't have to, I'm hear to just show you my injuries, not tell you what happened. And I said, well, okay, that's, you know, that's what I meant. But like I said, I didn't just, I didn't say it the right way the first time.

ED    Okay, did he show you his injuries?

AD    He showed, uh, a few and

ED    What injuries did he show?

AD    Uh, I saw the, he said that he could not hear on his left side. He was having trouble hearing and, uh, (inaudible)

ED    Did you see any injuries to his left side?  Uh, you, you're pointing to the left side of your head.  Is that what you mean to his

AD    But he was pointing, he said his ear.  He could not hear.

ED    Okay

AD    So I'm (inaudible) point to my ear.

ED    Okay

AD    I talk with my hands.  So

ED    Okay, did the inmate have any bruises around his head?

AD    Well, he had a, uh, a little red area, like right here.

ED    Is that on the right or the left side?

AD    On the left side

ED    Okay

AD    Yeah, uh, he pulled down his pants and he showed me, uh, abrasion.  It was kind of small.  Abrasion, like on his, like on his waist, in the waist area.

ED    Is that on the left side also?

AD    Yeah, it was on the left side, yeah.

ED    Okay, did he show you anything else?

AD    Uh, there was an abrasion on his left forearm, and, uh, and like I said, I was getting the, he did a lot of talking, but I was just initially getting the body chart started so

ED    Okay, did inmate, uh, Griffith show you a mark to his or a bruise to his left thigh area, to the back of his thigh, to the left leg?

AD    Now, that one, I did not see.  The one on the back of his thigh, I didn't,

ED    Right

AD    I did not see that one.  I just saw the one up near his waist.  Uh, he end up, he asked, uh, I told Nurse Leveret to, you know, he could go ahead and finish up.

ED    Okay, before you got to Nurse Leveret,

AD     Okay, before

ED     what did inmate, what did inmate Tericus, correction, what did inmate, uh, Griffith say how these injuries occurred?

AD     He said that he was assaulted by an officer.

ED     He said that he was assaulted by an officer?

AD     Yeah, and he used this terminology, uh, uh, it was a DOC terminology, common (inaudible) something or other.

ED     Was, did he

AD     And he, uh, (inaudible)

ED     Did he state, did he say common coronial shot?

AD     That's it.

ED     To the leg?

AD     Right, that's it.

ED     Okay, he said he had received that from an officer?

AD     That's what he said.

ED     And did he show you this shot to the leg?

AD     He, it was just a red area, small.

ED     In back of his thigh?

AD     Not the back of the thigh, like to the side, you know, like down toward kind of near his knee, but a little, uh, I say about 2 to 3 inches up from the knee on the left thigh.

ED     On the left thigh area?

AD     Yeah, yeah,

ED     Okay

AD     And, uh,

ED     So you did see that?

AD    Just, it was slightly red and not, it wasn't hardly that, you have to just, well, with him being Caucasian, you know, the, you can see redness real good, so it was, it was small redden area there.

ED    Okay

AD    Uh, he, well, anyway, at that point, I asked, uh, well, I didn't, well, hold on. Wait a minute. I'm getting mixed up. I asked Nurse Leveret to come and finish the body chart and he did not, well, Leveret was asking him, trying to ask him questions, he had like this smart alecky, you know, remarks, and he asked, well which one of you are gonna do the body chart. So

ED    And why did you call Nurse Leveret?

AD    Why did I?

ED    Yes

AD    Because you, well, usually when I'm working population, I just mainly just pass pills or whatnot, and I was just getting it started because the CNA was on break. So

ED    Okay

AD    Usually, like I say, with the CNA's job, you just get the vital signs.

ED    Okay

AD    And the nurse usually finish it out.

ED    Okay, so that wasn't your normal duty since you were population?

AD    Right

ED    Okay, so you gave it to, you gave this inmate to, you started the body chart.

AD    Right

ED    But you in turn gave it to Nurse Leveret?

AD    Right

ED    And Nurse Leveret, uh, finished the body chart. Is that correct?

AD    Yeah

ED    Was it, were you still in the room at that time?

AD    No, I had left.  Uh, I ended up

ED    At what point did you leave?

AD    After I gave it to him, I went back up to population to get, I was about to take a break. Well, like I say, I was on break as well, so anyway, I was about to eat.  So I went up to population to get change so that I can go to the, uh, snack machine and get a soda, and I came back down to westward, and that's where I had lunch that night.

ED    Okay, alright, uh, is anything else you'd like to add to this statement?

AD    Uh, no, I can't, I can't think of anything right off.

ED    Okay, this will conclude the tape-statement taken from Miss Alfreda Dulaney.  End of statement, Investigator E. S. Demus

ED/ch

# STATEMENT OF INMATE JODY GRIFFITH

Statement of Inmate Jody Griffith

Page 1 of 9

The following will be a tape-statement. This statement will be taken from inmate Jody J-O-D-Y Griffith G-R-I-F-F-I-T-H. He'll be a white male, and his date-of-birth will, (inaudible) his AIS number will be 249169, and his date-of-birth will be 9-11 of 1971. This statement will be concerning the alleged, uh, assault on inmate Jody Griffith by Officer Gary Anderson, which was said to have occurred on 11-23-2006 at Kilby Correctional Facility.

ED     If you will, inmate Griffith, tell me exactly what happened on the date that you were allegedly assaulted by Officer Gary Anderson. Go ahead.

JG     I was in my cell and it was, uh, shower time. Uh, I was handcuffed, released from my cell along with some other inmates, uh, directed toward the bottom tier shower area. Uh, upon arriving at the shower area, uh, there was another inmate in the shower. Me and, uh, inmate Jordan was standing outside the shower waiting

ED     Was that inmate Christopher Jordan?

JG     Yes sir, uh, we were waiting on the inmate that was in the shower, uh, to get finished. Uh, Officer Anderson unhand cuffed myself and inmate Jordan outside the (inaudible), uh, shower room, and as the inmate finished showering, he stepped out and, uh, Officer Anderson directed Jordan in the shower, and then he tells me let's go. I didn't know what he meant to begin with and he pointed to the shower, said can't you see the water run? Get in the shower. I was a PC inmate and the other inmate was a PC inmate. You know, it kind of took me by surprise the begin with. I stepped in the shower. Didn't have any problem with that.

ED     PC meaning?

JG     Protective custody

ED     Go ahead.

JG     Uh, and I stepped in the shower, the shower, uh, me and the other inmate, Jordan, we were discussing the previous inmate that had been in the shower. Uh, long story there, but (inaudible) comical. Uh, I overheard Officer Anderson saying Waldo, can't you fucking take a shower and talk at the same time? I didn't know who he was talking, because he said Waldo, but when I turned around and looked, he was looking at me, said, yeah, I'm talking to you. He said can't you fucking talk and shower at the same time? I'm like I am showering. Well, I continued to shower and said something else to the inmate, and then Officer Anderson, okay, that's it. Fuck it, Waldo. Get your ass out of the shower. I said, I said I got a few minutes, you know, to take a shower. He said get your ass out of the shower now. I was like, yes sir. So I was rinsing my soap out of my hair and stuff, then I walked over to the corner, started drying off. The other inmate, Jordan, still in the shower under the water. I'm in the corner, front corner of the shower drying off, I hear the door click where it's unlocking. I figure he was fixing to let me out.

The door hits me, forcefully and it kind of takes me by surprise. Officer Anderson already steps in the shower and said you ain't gonna get out of the fucking shower? And he hit me with his baton.

ED   Where did he hit you at?

JG   Hit me in my leg, left leg.

ED   Is that where you received the first bruise at?

JG   Yes sir

ED   On your left, back of you left thigh?

JG   Yes sir

ED   Okay, go on.

JG   That, I mean, that really surprised me there. And he said something else to me I believe and then the next thing I know, I'm laying on the floor outside of the shower area.

ED   How did you get on the floor?

JG   I don't know if he pushed me or knocked me. I don't know, I, I blacked out momentarily. I don't know how I got on the floor. All I know is just waking up and just seeing the floor in my face.

ED   Okay, now, you stated that Officer Anderson came in the shower forcefully?

JG   Yes sir

ED   How did that happen?

JG   Uh, while I was, while myself and inmate Jordan was in the shower, I was drying off. Jordan was still under the water. Like I said, I heard the door click and the door come open, but it come open and just hit me.

ED   Where did it hit you at?

JG   On my wrist area, left wrist area

ED   On your left wrist?

JG   Yes sir

ED   Did it hit you anywhere else, the door?

JG    I don't know, I mean, I just know it hit hard, I mean.

ED    Okay, after the door hit you, and you stated it hit you hard, what happened next?

JG    I just see Officer Anderson step in the shower like (inaudible) one step, maybe two steps in the shower, and he's facing me. I got my side, you know, turned to him, you know, where I was drying off. And then, like I say, he said, you know, I told you to get your ass out of the shower. (inaudible), he hit.

ED    And that's when he hit you on the back of your left thigh?

JG    Yes sir

ED    What did he hit you with?

JG    A baton

ED    A baton? And did you say anything to him at that time?

JG    Not that I remember, I mean, I (inaudible)

ED    Did you say anything to him before he hit you?

JG    No sir

ED    Did you make any overt moves toward him and try to strike him?

JG    No sir

ED    Okay, and who was the other inmate that was in the shower?

JG    Uh, Jordan, Christopher Jordan, Chris Jordan

ED    Okay, after Anderson, after Officer Anderson hit you on the back of your left thigh, what did Officer Anderson do at that time after that?

JG    I don't know if he, he grabbed my arm or what he done, but like I say, the next thing I know, I'm laying on the floor outside the shower.

ED    You don't know how you got on the floor outside of the shower?

JG    To be honest, no sir.

ED    Okay, so exactly where were you laying at outside of the shower?

JG    Just right outside the door on the floor.

ED     Okay, were you, at that time, were you struck any, do you remember being struck again by Officer Anderson?

JG     I remember being nudged. I don't know if it was with the baton or with the shoe, you know, he was telling me, uh, to get back in my cell basically.

ED     What did, how was he talking to you?  Tell me about that.

JG     He was saying, uh, get your bitch ass up to your cell.

ED     At that point, uh, what were you injuries at that point?

JG     I knew I was hurting.  I knew I was, you know, semi-conscious.  Uh, I was feeling a lot of pain in my leg and in my head on the left side.  Uh, I wasn't able to get up, but he kept telling me, you know, get up or he was gonna take, you know, take the stick to my ass again.

ED     Okay, was any other inmates in the area at that time?

JG     Yes, I know Christ Jordan.  I know he was standing in the shower and I could hear other inmates saying, you know, making remarks to Officer Anderson about, you know, he needs to go to the infirmary.

ED     Okay, and were you taken to the infirmary?

JG     Uh, not immediately, no

ED     When were taken to the infirmary?

JG     At best guess, a couple hours, two hours later

ED     Okay, and what happened when you went to the infirmary?

JG     Uh, escorted to the infirmary by Officer Dinkins, sat down, was talking to the, uh, a black female nurse.  She was taking my vital signs and stuff.  And, uh, I started showing some of the injuries and you want a detail on this also.  Correct?

ED     Yes sir

JG     Uh, started showing some of my injuries.  Two more officers and a black male nurse came out of a room to the left and the black male officer, you know, he, when he seen the back of my leg, goes ooooh, what happened?  I said, I said common coronial shot.  He kind of chuckled and he said what do you know about a common coronial shot?  I was a correctional officer for ten years.  I said class '94 3.  And he said something to the affect of class '84 3 or '85 3,  you know just, he gonna let me know how long he had been with the department and, uh, everything was fine so far.  And, uh, the female

nurse told the male nurse, asked him to document the injuries on the body chart. And he said, uh, made something like, you know, I was fixing to eat. He said, okay. He said, uh, what's wrong with you? I said I was assaulted by an officer. Uh, I, I was assaulted by a DOC. He goes, well let's see, you know, and I showed him my hip. He said you gonna make me look all in a man's ass right before I'm fixing to eat? Talking to the female nurse. He said, uh, he said, what happened to you? I said (inaudible) assaulted. He said, uh, by who? I said by an officer. He said well, who was it? I knew what he was getting at. And I said, I said, sir, all, all I need you to do is just document my injuries. He said, uh, what, something like, you know, you can't tell me or something like this. I said, I said all I need you to do is just document my injuries. He said, uh, he said there's sixteen-hundred of ya'll and only thirty or forty of them. He said, I said, no, I, before that, I said, uh, I said you're medical. I said they're DOC. I said all I need you to do is just document the injuries. He goes there's sixteen-hundred of ya'll, only thirty, forty of them. Who you think I'm gonna ride with? I said all I need you to do is document my injuries. (inaudible) he said, you know, after I told him about the DOC medical, he said, oh, you gonna get smart. I said, no sir. I'm not getting smart. All I need you to do is document my injuries.

ED      Uh huh

JG      But, uh, he kind of looked at Officer, uh, Dinkins, and said, okay, I'm finished. The body chart still laying here on the table to my left and he's standing in front of me. So I know he didn't write anything on the body chart. I'm like you ain't gonna document anything? I don't see nothing. I said you don't see this? He goes I'm through, I got you.

ED      Where did he, where did you point to on your, on your body that (inaudible)?

JG      At that time, on my hip.

ED      On your hip?

JG      Yes sir, (inaudible)

ED      You had bruises on your hip?

JG      Yes sir

ED      And on your back of your left thigh?

JG      Yes sir

ED      Is that your left hip also?

JG      Yes sir

ED      And your left arm?

JG    Left arm, left heel

ED    And your left, the left side of you head?

JG    Yes sir

ED    Any others?

JG    Maybe just some minor scratches and stuff, abrasions on the outside of my left knee, uh, left toe, uh, a skin place on the left front of my, left part of my shin, left leg shin area.

ED    What about your shoulder area?

JG    Yes sir, everything is about healed up accept for my, my leg just about.

ED    Okay, alright, inmate Griffith, uh, I have some photographs, some Polaroid photographs that were taken of you right after this incident was said to have occurred by an officer. Do you know which officer took these photographs of you?

JG    Uh, there was photographs taken, that was the next day, that was by an inmate.

ED    Sir?

JG    These photographs, they were taken by an inmate.

ED    They were taken by an inmate?

JG    Yes sir

ED    Would that have been an inmate runner or something?

JG    Uh, I think I, think I seen him run around in a kitchen apron since then.

ED    Okay, uh, he took them for what purpose?

JG    Uh, he was, uh, directed by Sergeant Riley to take these photographs.

ED    Okay, do those photographs there actually depict the injuries as they were at that time?

JG    Yes sir

ED    When you, okay, there is another stack of photos here that were also taken, uh, do you know who took those photographs?

JG    Uh, Lieutenant, I can't remember his name.  Large black male

ED    Lieutenant, a lieutenant here at Kilby?

JG    Yes sir

ED    Okay, does those photographs also depict your injuries as they were noted, uh, uh, as you remember on the date or right after the, this occurred?

JG    Yes sir

ED    Okay, okay, alright, is anything else that, uh, you'd like to add to this statement?

JG    Uh, just on a personal note, I feel that, that the way the incident took place and the length of time it took for it to be reported, I feel that it was gonna, it was gonna be, it was an attempt to cover the, uh, incident up. Like I say, I was instructed back to my cell. While I was on the floor, I did ask to go to the infirmary. That wasn't happening. I was told to go back to my cell period, no if, ands, or but's about it.

ED    Okay

JG    And on the floor I

ED    Now, who did you ask to go to the infirmary?

JG    At the time I was laying on the floor, I asked, uh, to be sent to the infirmary by Officer Anderson.

ED    Okay

JG    And then, uh, I mentioned it to, uh, Officer Peterson when I got back to my cell.

ED    Uh huh

JG    He was on the top tier, uh, taking handcuffs back off the inmates after they returned to their cell. Uh, he said that, uh, I asked to go to the infirmary to see the, uh, shift commander and he said that, uh, he asked me what happened. I told him. He told me that he would let him come up and talk to me, referring to Officer Anderson, I assume.

ED    Uh huh

JG    Uh, then he left. Like I said, (inaudible), I think it was another officer in between that time and, uh, when I did get to talk to Officer Dinkins, but when Officer Dinkins came up, I showed him my injuries, told him briefly what had happened, he left and in a matter of a couple of minutes, I would assume, he came back.

ED    Okay, alright, inmate Griffith, uh, there was, on that first body chart that was done, uh, do you know what type of injuries were reflected on that body chart?

JG    No sir, not (inaudible).

ED    Okay, was there another body chart that was done on you that same day?

JG    Yes sir

ED    About how, how long afterwards?

JG    I know it was done around 9:20 because I seen the clock when I was sitting in the office area.

ED    Okay, and why was that second, uh, body chart ordered?

JG    After we left the infirmary, uh, myself and Officer Dinkins, uh, we was going down the corridor and I told Officer Dinkins, I said I need to see a shift commander, because the nurse and, uh, that I seen hadn't documented anything on the body chart. He said, you know, hold up. I'll look to see if he's in the office.

ED    Uh huh

JG    He kind of motioned for me to slow up. He looked in the office, said he ain't in there. I said Officer Dinkins, I said I need to see a shift commander? He said, said, Griffith, he said, I assure you, he said, you'll see a shift commander before the shift commander before the shift is over with. He said he will see to it personally that I got to see a shift commander. Him and, uh, uh, Sergeant Smith and another officer came up to my cell maybe thirty minutes later. I mean, I'm not sure about the time frame, because I hadn't got a watch, but you know, I assume, you know, twenty, thirty minutes passed or so. Uh, Sergeant Smith asked me what had happened. I told him and I said that, uh, you know, the nurse hadn't properly documented the injuries. He said, well, I seen the body chart. I said, Sir, I said did it show this, and I started showing the injuries. He kind of looked around and he left and come back, gave me a piece of paper and told me write a statement out, and then, uh, they brought me back down to do another body chart.

ED    Alright, and that was, uh, Sergeant, uh, Anderson?

JG    No

ED    No

JG    That was Sergeant Smith, I believe.

ED    Yeah, Sergeant Alex Smith, that's who that was, okay. Is anything else you'd like to add to this statement?

JG    As sure as the world when I get back to my cell, I'll remember something, but right now, I don't.

ED     Have you ever had any problems with, uh, Officer Gary Anderson in the past before this occurred?

JG     No sir

ED     What were you doing in segregation?

JG     Uh, PC

ED     Why were you in PC?

JG     Because (inaudible), because I, my previous job.

ED     Oh, because of your previous job being a correctional officer (inaudible).

JG     Yes sir

ED     Okay, uh, is it known at the institution that you were a correctional officer at one time?

JG     Uh, known by

ED     Inmates

JG     Several inmates know of me, yes sir.

ED     Okay, okay, is anything else you'd like to add?

JG     Uh, no sir

ED     Alright, this will, have you told the complete truth in this statement?

JG     Yes sir

ED     Would you be willing to take a polygraph test?

JG     Yes sir

ED     Okay, alright, this will conclude the tape-statement taken from inmate, uh, Jody Griffith. End of statement, Investigator E. S. Demus

ED/ch

## STATEMENT OF INMATE CHRISTOPHER JORDAN

The following will be a tape-statement.  This statement will be taken from inmate Christopher Jordan.  He'll be a white male, AIS number 161847, and his date-of-birth will be 11-4 of 1970.  Uh, this statement will be concerning the alleged assault on inmate Jody Griffith, uh, by Officer Gary Anderson, which occurred on 11-23-2006 at Kilby Correctional Facility.

ED     Slide your chair.  If you will, inmate, uh, Jordan, tell me exactly, uh, what you saw and heard occurring on the date of, uh, November the 23, 2006 at Kilby Correctional Facility in the segregation unit.

CJ     Well, we'd gone down to shower.  What he had done, he put both of us in the shower at the same time.

ED     Okay, who put both of you in the shower?

CJ     The same one that did that to him.

ED     Okay, was that Officer Anderson?

CJ     I'm not sure of his name.  I'm not sure of his name.

ED     Okay

CJ     But, uh, kind of a dark skin fellow.

ED     Okay

CJ     But, uh,

ED     Can you describe him?

CJ     He was about, about your build I guess, a little bit, uh, he, he about your build.

ED     Okay

CJ     And he, what it is, but he, he's darker than you are.

ED     Dark skinned?

CJ     Yes sir, and (inaudible)

ED     Black male?

CJ     Yes sir

ED   Okay

CJ   And what he had done, he took and he asked Jody, he says, you can't shower and talk at the same time?  So then, when he did, he went in and cut the showers off and then when he did that, uh, he told Jody to grab his stuff.

ED   Okay, let's go, let's back up a minute.  You and Jody, uh, uh, uh, you and, uh, Jody Griffith were in the shower together.  Is that correct?

CJ   Yeah, yeah

ED   In the segregation unit

CJ   Yes sir

ED   When was the first time that Officer Anderson said something to Jody Griffith?

CJ   Right before he cut the showers off.

ED   And what exactly did he say?  What was the conversation?

CJ   He just asked him, he says you can't shower and, uh, talk at the same time?

ED   And what did Jody say?

CJ   Jody just, he didn't, he didn't really, he looked at him and then what he did, he just, I'll tell you what, so then what he did, he walked down the hallway and got up inside the part where you turn the showers on and cut them off.

ED   Okay, this is, Officer Anderson did that?

CJ   Yes sir, and when he come back, Jody had grabbed his towel, right, and started drying off, and what had happened was he took and opened the, the, uh, iron door and when he did, he threw it, uh, and what it did

ED   Okay, you, the iron door, is that the shower door?

CJ   Yes sir

ED   Okay, the shower leading inside of the shower?

CJ   Yeah

ED   The door leading inside of the shower?

CJ   Yeah

ED    It's a iron door?

CJ    Yes sir

ED    Okay

CJ    And what had happened, it hit him in the side, the side of the head right.  So what he did, he takes the stick out, hits him in the leg.

ED    Who does that?

CJ    Officer Anderson

ED    Okay

CJ    And what he does, Jody takes and he still didn't move.  He just sat there and what had happened was

ED    Wait a minute.  After he hit him, where did he hit him at now?  Where did the officer hit him at?

CJ    In the leg, in the leg

ED    And what did Jody do at that time?

CJ    He told him, he says, man, hold on.  And, and, uh, because, I mean, he was doing just what he was supposed to be doing.  And what he did, the Officer Anderson grabbed him by the back of the neck and threw him down, and what he did, he tripped over that, that part that you step out of the shower, went face first.  And then, what he had done, he kept telling him, calling him a bitch, telling him to get up.  And, uh, he saw me looking over there at his stuff and I started to get it.  He said if I tell you to get out that shower, you get out that shower.  And he told me, he says, come on, man.  So anyway, I, I didn't even mess with his stuff.  I just left it alone because I didn't want to go through the same problems.  So what I did, he, he told me to take my, uh, get upstairs to my cell.  So I did.  Got in there.  It still took about another fifteen minutes for him to bring him up.  I don't know what happened after they, I went up them stairs, but, uh, when I left, he was on the ground still.

ED    Uh, did you hear any of the conversation?  Was Jody saying anything while he was on the ground?

CJ    No sir

ED    Okay, was Officer Anderson saying anything?

CJ    Call him a bitch.

ED    Calling him a

CJ    A bitch, telling him to get up.

ED    Okay, was any other inmates in the area that witnessed that?

CJ    Yes, there was.

ED    You know who they were?

CJ    Yes sir, I do.

ED    Who?

CJ    Kenny Smith, he's in 1-Cell back up there on D-Block.

ED    Okay

CJ    He's kind of a short, uh, colored fellow.

ED    Okay, anybody else?

CJ    Uh, he's the only one that I know of.

ED    Okay, okay, how many times did you see Officer Anderson hit inmate, uh, Jody, uh, Griffith?

CJ    He hit him with that stick in the leg, but, and then he kept acting like he was gonna hit him when he was on the ground, because he wouldn't get up.  Jody said that he, he got knocked out for a few minutes, you see what I'm saying.  And, uh, as hard as he threw he threw him down, I, uh, uh, wouldn't surprise me because he cut the side of his head when he hit that ground.  And, uh, I take and, I didn't know if he was gonna hit him again or not, but, uh, he kept acting like he was going to and then finally, once he told me to get out of there, I took and, uh, like I said, did what I was supposed to do, went on up to my cell, and, uh, about ten, fifteen minutes later, here come Jody.  I didn't hear anything else after that, but, uh, the fellow in the cell on the other side of Jody was down there in the shower whenever I had to come up.  So he may have seen something.  I couldn't tell you.

ED    Did Jody make it up to the shower, uh, up, up to his cell unassisted?

CJ    Well, I, I didn't really, uh, he was walking by himself, but he had the police right there with him, you know what I'm saying.  I don't know if they was trying to guide him or what, but, uh, it, it kind of looked to me like he was walking in his cell by himself.

ED    Okay

CJ    But then again, I, like I said, I'm not sure.  Now, don't quote me on that, but, uh, like I said, I, I don't see why that man had any reason to take him to do that.  I mean, they takes him, all he was doing was talking and there's people that holler to other people that, uh, don't get nothing said to them.

ED    Okay, so who was he talking to?  You?

CJ    He was talking to Jody.

ED    You and Jody were talking?

CJ    Yes sir

ED    Okay, what were ya'll talking about?

CJ    He had, uh, said something about another inmate in the back, back then.  I just told him, I says, I agree with you.  And what it is, is just as we started to speak, because we wasn't in there a couple minutes, and, uh, just as I started telling that I, uh, agreed with him about what he had said, that's when he come in there and, uh, Jody, uh, started to say something.  I don't even know what he started to say because, uh, he got cut off right at, uh, right when he started to speak, and that's when he asked Jody what he did and cut the showers off.  But, uh, I, uh, he didn't say anything to me.  Uh, when he told me to get out, I took and, like I said, he, he didn't really tell me to get out until, uh, I looked over to try and check on his stuff and I was gonna grab his shampoo and his, his, uh, his other stuff in there and give it back to him when we got back to the cell.  But, uh, when he saw me looking over there at it, that's when he told me to come on.  I just, I just left it alone because I didn't need the trouble.

ED    Alright!  Were you and Jody in the same cell in seg?

CJ    No sir, we was right next door to each other.

ED    Right next door to each other, okay.  Alright, alright, inmate, uh, Jordan, is anything else you like to add to this statement?

CJ    No sir, that's it.

ED    Okay, have you told the complete truth in this statement?

CJ    Yes sir, I have.

ED    Would you be willing to take a polygraph test as the truthfulness of this statement?

CJ    I'll take one.

ED    Okay, uh, this will conclude the tape-statement taken from inmate, uh, Christopher Jordan.  End of statement, Investigator Errick Demus

ED/ch

## STATEMENT OF COI ANTHONY PETERSON

The following will be a tape-statement. This statement will be taken from Anthony Peterson. He'll be a black male. Uh, date-of-birth 1-28-1973. His address will be 7064 Taylor Road North, Apartment H, Montgomery, Alabama, 36117, and his phone number will be 279 5593.

ED    Uh, Officer Peterson, uh, on the night of this, uh, offense involving inmate, uh, Jody Griffith and Officer Gary Anderson in the seg unit, uh, do you remember being in the segregation office after this incident occurred?

AP    Yes, I do.

ED    Who was all in that segregation office?

AP    Myself, Gary Anderson, and Officer, and Sergeant Allen Smith

ED    Okay, was, uh, Officer Dinkins also present?

AP    Yes, he was. Officer Dinkins also was present.

ED    Dinkins

AP    Officer Tericus Dinkins

ED    Okay, uh, I'm gonna ask you to tell me about the conversation that Sergeant Allen Smith had with Officer Gary Anderson on that particular time.

AP    Uh, the particular conversation what the statement that I was aware of, he just told him to tell the truth about whatever conspired between him and inmate Griffith.

ED    Okay, now, who you, who you speaking of now?

AP    Sergeant Smith, I'm speaking of Sergeant Smith.

ED    And he, he told who now?

AP    Officer Gary Anderson to tell the truth.

ED    In a statement?

AP    Well, in the, in the, by, by word, by his mouth. It came out of his mouth as far as physical.

ED    Okay, so Sergeant Smith was asking or telling, uh, Officer Anderson to tell the truth?

AP    He was telling him to tell the truth.

ED    Okay, and exactly what did, uh, Officer Anderson say at that time?

AP    Uh, at that particular time, if I remember, he said, okay.

ED    Okay, now when Sergeant Allen Smith was telling Officer Anderson to tell the truth, what did he mean by that?

AP    I guess he was telling, uh, well, I'm assuming he was telling him to tell the truth about whatever aspired between him and inmate Jody Griffith.

ED    Okay, alright, do you remember any of the other conversations that Sergeant Smith had with Officer Gary Anderson?

AP    No, I do not, Sir.

ED    Okay, do you remember, uh, what Sergeant Smith said to you?

AP    To me?

ED    Yes sir

AP    Basically, just told me to tell the truth also.

ED    Okay, do you remember what Sergeant Smith said to, uh, Officer Dinkins?

AP    No, I do not.

ED    Okay, okay, alright, uh, Anthony, uh, Officer Peterson, did you ever hear Sergeant, uh, Sergeant Smith tell Officer Gary Anderson to make sure that Officer Anderson had two officer's named in his statement?

AP    No, I did not, Sir.

ED    So you never heard Sergeant Smith make that statement?

AP    No sir

ED    Okay, alright, Officer Peterson, is there anything that you can further remember, uh, about the conversations in that shift office, (inaudible), correction, in that segregation office?

AP    Uh, no sir, no sir

ED    Okay, uh, okay, Officer Peterson, how did you, uh, come to be in the seg office at that time?  Were you called down there or what?

AP    Uh, matter of fact, I, I think I was in the seg office at that time. I was in the seg office at that time, because that's basically where we go whenever we finish doing whatever we got to do.

ED    So you were already there when Sergeant Smith and the other officers came in?

AP    Well, we conjured in, right.

ED    Okay

AP    Well, we conjured in, in the segregation office.

ED    Okay, Officer Peterson, uh, is anything else you'd like to add to this statement?

AP    Uh, no sir

ED    Okay, have you told the complete truth in this statement?

AP    Yes, I have, Sir.

ED    Okay, this will conclude the tape-statement taken from Officer Anthony Peterson. End of statement, Investigator Errick Demus

ED/ch

# STATEMENT OF COl ANTHONY PETERSON

The following will be a tape-statement. This statement will be taken from Officer Anthony Peterson. He'll be a black male. His date-of-birth will be 1-28 of 1973. His address will be 7064 Taylor Road North, Apartment H as in hotel, Montgomery, Alabama, 36117, and his phone number will be 279 5593.

ED    If you will, Officer Peterson, will you tell me if you were working on the night of 11-23-2006 at Kilby Correctional Facility?

AP    Yes, I was, Sir.

ED    Okay, in what capacity were you working at that time?

AP    I was in segregation.

ED    Okay, uh, do you remember an incident that occurred between Officer Gary Anderson and inmate Jody Griffith?

AP    No, I do not, Sir.

ED    Uh, do you, uh, you, do you know Officer Gary Anderson?

AP    Yes, I do, Sir.

ED    Was (inaudible), was Officer Anderson working in the seg unit at that time?

AP    Yes, he was, Sir.

ED    Okay, did you hear of an incident involving Officer Gary Anderson and inmate Jody Griffith later after it occurred?

AP    Yes, I did, Sir.

ED    What exactly did you hear?

AP    I heard that he was just in an altercation with inmate Jody Griffith. I didn't hear any specifics or anything. It was just an altercation, Sir.

ED    Okay, you both were working in the seg unit at that time. Is that correct?

AP    We were in the seg unit at that time.

ED    Okay, did you see Officer Gary Anderson involved with inmate Jody Griffith?

AP    No, I did not, Sir.

ED    Okay, Officer, uh, Peterson, uh, there was a statement that was done; there were
      actually two statements that were done in your name on the date of this offense, which
      was 11-23-2006. The first statement, you did not sign. Uh, in that statement, uh, it
      indicated that you possibly had witnessed the altercation between Officer Anderson,
      Officer, uh, Anderson and inmate Griffith. Uh, was that statement true?

AP    No sir

ED    Uh, do you know who wrote that statement up for you?

AP    No, I do not, Sir.

ED    Okay, uh, did you sign that statement?

AP    No, I did not, Sir.

ED    And why did you not sign that statement?

AP    Because I did not agree with that statement, Sir, because it was things in that statement
      that were untrue.

ED    It was a untrue statement?

AP    Yes, that's why, and I didn't agree with it.

ED    Okay, did you, uh, bring that up with Captain Barrett?

AP    Yes, I did, Sir.

ED    And what exactly did you tell Captain Barrett?

AP    I told Captain Barrett, uh, I did not witness the altercation. I was up on D-Block at the
      time (inaudible) inmates up and let them go out.

ED    Okay, uh, Officer Peterson, uh, did you subsequently give another statement?

AP    Yes, I did.

ED    Okay, was that given on the same day?

AP    No, it wasn't, Sir.

ED    When was that given?

AP    That was, that statement was given Tuesday, the Tuesday after the incident.

ED    Okay

AP    Which would be, I think, if I'm not mistaken, the 27th or 20, it was that Tuesday because I'm off on Sunday's and Monday's, and it happened on the 23rd.

ED    Okay, in your second statement, what exactly did you say?

AP    At approximately 4:15 on November 23, 2006, I, COI Anthony Peterson, was on D-Block conducting showers. I did not witness the altercation between COI Gary Anderson and inmate Jody Griffith that occurred on C-Block Segregation Unit.

ED    Okay, did you sign that statement?

AP    Yes, I did, Sir.

ED    Is that true and accurate account of your activities or your, what you saw concerning that incident, which was nothing?

AP    Yes sir, yes sir, it is.

ED    Okay, uh, is there anything else that you know of? Do you know anything about this offense that occurred between Officer Anderson and, and, uh, inmate Griffith?

AP    That's it, Sir.

ED    Okay, alright, uh, Officer Peterson, have you told the complete truth in this statement?

AP    Yes sir

ED    Okay, is anything else you'd like to add to this statement at this time?

AP    No sir

ED    Okay, alright, this will conclude the tape-statement taken from, uh, inmate, uh, Ant, uh, excuse me, Officer Anthony Peterson. End of statement, Investigator Errick Demus

ED/ch

## STATEMENT OF SERGEANT ALLAN SMITH

The following will be a tape-statement. This statement will be taken from Sergeant Allan A-L-L-A-N Smith. He'll be a white male. Date-of-birth will be 12-1 of 1965. His address will be 108 Hickory Road, in Deatsville, Alabama, 36022. His phone number will be area code 334 and the number is 207 1846.

ED    If you will, Sergeant Allan, can you tell me the events that happened in the, uh, seg unit there at Kilby Correctional Facility on November the 23rd of this year. Go ahead.

AS    (Inaudible) I was radioed by Officer Anderson around 4:30. Stated he had a little altercation with a inmate in the seg unit, (inaudible) want to come out the shower. He says the inmate slipped, cut his ankle, and that he was going to write him up for disobeying a direct order. I informed Officer Anderson to go ahead and get me body chart on the inmate and handle his paperwork.

ED    Okay, did he in fact do the body chart when you instructed him to?

AS    The body chart was done, I want to say around 6 o'clock.

ED    When did this incident occur?

AS    Around 4:30 is what he told me.

ED    Uh, it's my understanding that, uh, uh, Sergeant, uh, Sergeant Allan, that, uh,

AS    Sergeant Smith

ED    Sergeant Smith, that, uh, uh, Officer An, Officer Anderson did not immediately order the, uh, take the inmate for a body chart. Is that correct?

AS    That is correct, but at the same time, we was also doing the, uh, Thanksgiving meal and everything was wide open at (inaudible) particular point in time. And so, I mean, that's what was happening at the particular point in time that I, we (inaudible) lock the hallway down and that sort of thing if he pulled him out, but they were not finish showering as of yet.

ED    Not finished showering?

AS    That I know of, because I was (inaudible) the kitchen the entire time.

ED    Okay, go ahead.

AS    Alright, uh, the body chart came back. (inaudible) the body chart and the only thing on the body chart it showed was a few scratches on his wrist. (Inaudible) after that, I figured (inaudible) was minor, nothing to it whatsoever. I went about, you know, my

regular duties for the day as a, a supervisor. At approximately 8:30, Officer Dinkins out of seg unit came out there and informed me that inmate Griffith wanted to speak to me. I asked him what was the concern. He didn't say. He just say he want to talk to me. So when I walked up in the seg unit about 8:30, 8:35, (inaudible) right there, uh, inmate Griffith started showing me marks, scratches, and scrapes, and so forth on his body that was not on the body chart when I first received it. Okay, I asked, uh, inmate Griffith, you know, as far as what happened. He stated that Officer Anderson pulled him out of the shower, uh, hit him with the baton, uh, then he blacked out. That's all he could remember until they picked him up and carried him to the cell block. Uh, I also asked if he had any witnesses to the affect what happened. He stated his, uh, cell partner, was next door to his cell, and I forgot what his name is, uh, saw the whole thing. So I went ahead and had them get paper and pen to write a statement, both of the inmates. Advised my officers to get paper and pen, write statements. Went back down to the shift office, called up, uh, Nurse Leverette who did the first body chart and asked him about, you know, the different things I see on his body, the abrasions and so forth. He said when the inmate walked down there, that he was disrespectful (inaudible), just, uh, uncooperative, and when Officer (inaudible), Mr. Lambert asked, uh, Leverette asked him what was wrong with him, the only thing he showed him was his wrist, said that's what's wrong with him, that's what's hurting. So Officer (inaudible), Nurse Lambert, uh, Leverette did his body chart and said he went on about his business. Uh, so then I went ahead and had Mr. Leverette do another body chart. This is probably about 9 o'clock, you know, right around that area, 9, 9 or 10 to do another body chart on the inmate to show all the abrasions and marks that he had now, and then I went ahead and, uh, called my supervisor.

ED    Alright, Sergeant Smith, there's eleven photographs here that were taken on the night of this offense that it occurred. Uh, did those photographs, uh, actually depict the way the inmate looked when you saw him? Did you depict the injuries to his person, inmate Griffith?

AS    Yes sir, these are, this is what I saw when I walked up on him.

ED    Okay, and these were the injuries that you asked, uh, Nurse Leverette about, why weren't they on the first body chart?

AS    Yes sir

ED    And Nurse Leverette advised you that the reason they weren't on the body chart because the inmate did not point them out to him?

AS    Yes sir

ED    Okay, alright, uh, Sergeant Smith, uh, you stated that you informed, instructed your officers, Anderson and Officer Dinkins to give statements?

AS    No, Peterson

ED   Peterson, excuse me

AS   Yeah

ED   Peterson to give statements?

AS   Yes sir

ED   Uh, did they in turn give those statements?

AS   Yes sir

ED   Uh, when you instructed Officer, uh, Anderson and Peterson to give these statements, where were you located at that time?

AS   Well, the first time I (inaudible) told them several times, shift office one time, and the seg office.

ED   In the seg office?

AS   Yes sir

ED   Okay, did you ever instruct Officer Gary Anderson to make sure that he had two officers' names in, named in his statement?

AS   No sir

ED   Okay, did you ever instruct Officer Peterson to make sure that he had two officers named in his statement?

AS   No sir

ED   Uh, exactly, what exactly did you say to Officer Gary Anderson and Officer Peterson concerning those statements?

AS   To make sure they were right and make sure they put down what happened?

ED   Okay, did you ever told, ask these officers to, uh, uh, give a false statement or encourage them to give a false statement?

AS   No sir

ED   Okay, did you ever tell the officers that the statements needed to be good and to make the statements good?

AS   I said make them good, make them truthful.

ED    Make them what now?

AS    Truthful

ED    Oh, make them good and make them truthful?

AS    Right, I also informed them several times that the DOC regulations, they would, they could be in more trouble by making false statements and then try to, to, you know, instead of, go and tell the truth instead of trying to make a false statement to try to cover their butts.

ED    Okay, you informed the officers of that?

AS    Right, that they would be in less trouble if they went ahead and made a mistake and admitted to it than making a false statement.

ED    Okay

AS    That was said to them several times.

ED    Alright, Sergeant Allan, uh, excuse me, Sergeant Allan Smith, concerning this, uh, incident with, uh, inmate Griffith, uh, what do you think happened during that time? What is your opinion on it?

AS    My opinion on it, I have mixed emotions because those, majority of those, uh, lacerations, uh, scars or marks could be inflicted by himself, but one of the ones that I was concerned about as far as being from an outside source, and that's the one on his leg. I mean (inaudible), uh, all those, the minor, you know, scratch and so forth, they could have been done in the cell block afterwards, but (inaudible) the only one I had any concern about was the one on his leg.

ED    Okay, alright, uh, Sergeant Smith, uh, so it's your testimony that you did not, uh, ask Officer Anderson to make a false statement?

AS    No sir

ED    Or to make sure that he had two officers named in his statement?

AS    No sir

ED    Okay

AS    The only thing I can figure out what he's referring to that was when I referred to him having shower, have two people in the shower at all times as far as the officer was, because, uh, I wanted three of them to be down there. They started showering during chow and I didn't tell them not to shower (inaudible) with two people.

ED    Uh huh

AS    But I assumed that they were gonna wait until Officer Dinkins got back in the shower to check the shower.  (inaudible) they had three people in the shower.

ED    Okay

AS    That's the only thing I can figure he's talking about.

ED    Alright, you have anything else you'd like to add to this statement, Sergeant Smith?

AS    No sir

ED    Alright, this will conclude the tape-statement taken from Sergeant Allan Smith.  End of statement, Investigator Errick Demus

ED/ch

FROM :KILBY WARDEN'S OFFICE      FAX NO. :334-215-6606      Nov. 28 2006 12:58PM P7

KCF 1062-b

## S-T-A-T-E-M-E-N-T

On November 23, 2006, at approximately 4:38 p.m., COI's Gary Anderson and Anthony Peterson placed inmate Jody Griffith W/249169 in the shower in the Segregation Unit. Inmate Griffith walked away from the shower door and began talking and joking. COI Anderson asked inmate Griffith to step back to the door to remove the handcuffs so he (Griffith) can began to shower. Inmate Griffith replied, "It's my shower and bath time which is my time". COI Anderson instructed inmate Griffith that shower time is for showering or he (Griffith) could go back to his cell. Inmate Griffith stood in place and COI Anderson turned the water off. COI Anderson gave another direct order to inmate Griffith to come to the gate. COI Anderson advised COI Peterson that I (Anderson) was opening the gate. COI Anderson and Peterson attempted to escort inmate Griffith who resisted by jerking away saying, "Don't put your god damn hands on me." At that time inmate Griffith fell to the floor. Grabbing him (Griffith) again by his arms, COI's Anderson and Peterson escorted inmate Griffith back to his assigned cell. At 5:06 p.m., COI Anderson advised Sgt. Allan Smith of the incident.

COI Gary Anderson

FROM :KILBY WARDEN'S OFFICE          FAX NO. :334-215-6606          Nov. 28 2006 12:58PM P8

KCf-1062 B

On November 23, 2006, at approximately 2:00 pm, Officer John Callens
assumed duties as North Control Officer. At approximately 4:30 pm, Officer
Callens assisted Officer Gary Anderson, and Officer Anthony Peterson in
conducting "D" Block showers. At approximately 4:45 pm, while observing
Officer Peterson on "D" Block, Officer Callens heard Officer Anderson
giving an Inmate several orders to exit the shower on "C" Block. Officer
Callens did not witness any further action.

Officer John Callens

FROM :KILBY WARDEN'S OFFICE          FAX NO. :334-215-6606          Nov. 28 2006 12:59PM P9

Statement by Jody E. Griffith #m 249169          P. 1 of 2

On November 23, 2006 during Second Shift I was placed
in handcuff and directed to the shower area.

Upon arriving at the shower area on the bottom tier of
the Seg unit I was ordered by Ofc Williams to enter the
shower allong with Inmate Chris Jordan #m 161847 (both of us or P.C.)

After approx. (3) three minites Officer Williams stated "You can't
talk and shower at the same time?

I stated "I am showering", and placed my head back under the water
Ofc Williams stated, "Wellto get your ass out of the shower,"

I said "let me finish." and walked to the corner of the shower
and began drying off.

Ofc Williams had left the area and returned when I had my
towel in my hand drying off. Inmate Jordan was still showering

Ofc Williams slammed the door open on me while I was drying
off. Hit me in the leg with his baton and said, "I told
you to get the Fuck out of the shower!" He then grabed me or
hit me but all I remember was lying on the floor with Ofc Williams
poking me with his baton stating "Take your ass back to your cell!"
Inmates were standing around the area. (At the time I was neither in
handcuffs or legirons)

Ofc Williams istructed another inmate to "Through his fucking slide
out of the shower to him." Ofc. Williams continued yelling at me to
get to my cell. I told him that I was "hurt real bad and need to go
to the infirmary." Ofc Williams stated "Take your ass to your cell or I'll beat it again."

After a few minutes of laying on the floor I was barely able
to stand and limp up a few steps where I fell again. I told Ofc William
numerous times that I need to go to the infirmary. He continued to yell
                                                              cont.

FROM :KILBY WARDEN'S OFFICE          FAX NO. :334-215-6606          Nov. 28 2006 12:59PM P10

Continuation of Statement by Jody E. Griffith W/m 249169          KCi 1062 B          2 of 2
11-23-06

I was finally able to limp to my cell where I informed
he other officers in the unit as they came by.

After 40 min — 1hr Ofc. Dinkins came and escorted me to the
infirmary. A bodychart was conducted...

I informed Ofc. Dinkins on the way back to the unit that I
wanted to talk to a supervisor because I felt that the bodychart
was insufficient (As I looked at the bodychart I seen no documentation
of my injuries)

Later Sgt. Smith came to my cell where I explained the
incident and showed him my injuries. I told him what was said
in the infirmary. I ~~told him that~~ I wanted to talk to I&I
and was willing to take a polygraph test. I asked him if the
bodychart reflected my injuries.

At approx 9:10pm a officer came and told me to write a statement.
I was then escorted out of my cell and given another bodychart. (The
nurse documented all my injuries on a piece of paper.

Sgt. Smith assured me that the On-call Official was notified
and I was escorted back to my cell. _____ W/m 249169

End of Statement

I AND DODY GRIFITH WERE IN THE SHOWER AT THE SAME TIME. THE OFFICER RUNNING THE SHOWER, TOLD DODY WHO WAS TALKING TO QUIT TALKING. HE TOLD DODY TO GRAB HIS SHIT, AND GET OUT. DODY WAS DRYING OFF WHEN THE OFFICER CUT OFF THE SHOWER AND THREW THE DOOR OPEN. THE DOOR SLAMMED INTO DODY. THE DOOR HIT HIM IN THE SIDE AND THE HEAD. THE OFFICER STEPPED INTO THE SHOWER HITTING HIM IN THE LEG WITH HIS STICK. GRABBED HIM BY THE BACK OF THE NECK, AND THREW HIM DOWN SLAMMING HIM DOWN ON HIS FACE. I WAS THEN ORDERED TO GET OUT. COOPERATING, I DID WHAT I WAS TOLD, AND RETURNED TO MY CELL.

WITNESS:
CHRISTOPHER P. JORDAN
161847     03

FROM :KILBY WARDEN'S OFFICE              FAX NO. :334-215-6606              Nov. 28 2006 01:00PM P12

KCf 1062 B

## S-T-A-T-E-M-E-N-T

On   November 23, 2006, at approximately 4:30 p.m., COI's  Gary Anderson and
Anthony Peterson placed inmate Jody Griffith W/249169 into the shower. COI G.
Anderson gave inmate Griffith a series of orders, which he (Griffith) didn't comply.
COI Anderson then left the shower and turned off the water. COI Anderson
returned and gave inmate Griffith a direct order to exit the shower again, inmate
Griffith did not comply. COI Anderson advised COI Peterson that he was opening
the shower door. COI Anderson then entered the shower with COI Peterson behind
him. As COI Anderson grabbed inmate Griffith's right arm, he (Griffith) jerked
away stating, "Get your god damn hands off me." At that time inmate Griffith fell
to the floor.  COI Anderson and COI Peterson escorted inmate Griffith back to his
assigned cell (D-#4)


COI Anthony Peterson

S-T-A-T-E-M-E-N-T

*KCF 06 - 1068*

At approximately 4:15 p.m., on November 23, 2006, I, COI Anthony Peterson was on D-Block conducting showers. I, (COI Peterson) did not witness the altercation between COI Gary Anderson and inmate Jody Griffith w/249169 that occurred on C-Block of the Segregation Unit.

_____

**COI ANTHONY PETERSON**



Right    Left    11/24/06
lower leg   Toe.
          Jody Griffith
          cw/249169



Jody Griffith
w/249169.
          11/24/06



Left    Jody Griffith
Knee.    w/249169
         11/24/06



Jody Griffith W/249169
11-27-06  CAC



Jody Griffith W/249169
11-27-06  CAC



Jody Griffith W/249169
11-27-06  CAC



Jody Griffith W/249169
11-27-06  CAC



Jody Griffith W/249169
11-27-06



Jody Griffith W/249169
11-27-06

**First Name:** Gary

**Last Name:** Anderson

**Race:** B    **Sex:** M

**DOB:**

**Job Title:** 60711 - Correctional Officer I

**Location:** Kilby CF

**Hire Date:**

**Height:**

**Weight:**

**Eye Color:** BRO

**Hair Color:** BLK

**Photo Date:**

**Print Count:**

**Last Changed By:**

Photo



[ 8 / 22 ]

http://doc_is4/empid/mainiface.asp

12/6/2006

**First Name:** John

**Last Name:** Capers

**Race:** B          **Sex:** M

**DOB:**

**Job Title:** 60711 - Correctional Officer I

**Location:** Kilby CF

**Hire Date:**

**Height:**

**Weight:**

**Eye Color:** BRO

**Hair Color:** BLK

**Photo Date:**

**Print Count:**

**Last Changed By:**

Photo



VIANET
© 1996-2000 Datacard Group

**[ 1 / 2 ]**

06-11070

| | |
|---|---|
| **AIS #:** | 249169 |
| **Name:** | GRIFFITH, JODY EDW |
| **Race:** W | **Sex:** M |
| **DOB:** | 09/13/1971 |
| **Height:** | 5'03" |
| **Weight:** | 158 |
| **Eye Color:** | HAZ |
| **Hair Color:** | BRO |
| **ID Marks:** | |
| **Location:** | Kilby CF |
| **Photo Date:** | 11/06/2006 |
| **Print Count:** | 1 |
| **Last Changed By:** | Maryella McCants |

**TOOLS**

SEARCH
LIST
SAVE
INSERT
DELETE
REQUERY
PRINT
PREVIEW
FIRST
PREVIOUS
NEXT
LAST

**Image**





© 1998-2000 Datacard Group

[ 1 / 1 ]

http://doc_is4/vianet/mainiface.asp

12/4/2006

**AIS #:** 161847
**Name:** JORDAN, CHRISTOPH
**Race:** W    **Sex:** M

| TOOLS_ | |
|---|---|
| **SEARCH** | **DOB:** 11/04/1976 |
| LIST | **Height:** 6'01 |
| SAVE | **Weight:** 215 |
| INSERT | **Eye Color:** BLU |
| DELETE | **Hair Color:** BLN |
| **REQUERY** | |
| PRINT | **ID Marks:** |
| PREVIEW | **Location:** Kilby CF |
| FIRST | |
| PREVIOUS | **Photo Date:** 11/17/2006 |
| NEXT | **Print Count:** 1 |
| LAST | |

**Last Changed By:** Maryetta McCants


Image


VIANET
© 1996-2000 Datacard Group

[ 1 / 1 ]

**First Name:** Anthony

**Last Name:** Peterson

**Race:** B     **Sex:** M

**DOB:** 01/28/1972

**Job Title:** 60711 - Correctional Officer I

**Location:** Kilby CF

**Hire Date:** 09/10/2001

**Height:** 6'04

**Weight:** 192

**Eye Color:** BRO

**Hair Color:** BLK

**Photo Date:** 10/05/2005

**Print Count:** 2

**Last Changed By:** BMcCann

Photo



[ 1 / 4 ]